(No. 51214.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ALAN GREER, Appellant.

*Opinion filed February 22, 1980.—Rehearing denied March 28, 1980.*

CLARK and MORAN, JJ., concurring in part and dissenting in part.

John H. Reid, Deputy Defender, and Robert E. Davison, First Assistant Defender, of the Office of the State Appellate Defender, of Mount Vernon, for appellant.

William J. Scott, Attorney General, of Springfield, and Donald Lowery, State's Attorney, of Metropolis (Donald B. Mackay, Melbourne A. Noel, Jr., Sandra L. Devine, Carolyn B. Notkoff, Mark L. Rotert, and Casimir J. Bartnik, Assistant Attorneys General, of Chicago, of counsel), for the People.

James J. Doherty, Public Defender, of Chicago (Robert P. Isaacson, Aaron L. Meyers and John Thomas Moran, Assistant Public Defenders, of counsel), *amicus curiae*.

MR. JUSTICE UNDERWOOD delivered the opinion of the court:

The defendant, Alan Greer, was charged in separate informations with the murders of Sharon Moss and her 8½-month-old fetus. He was found guilty of both murders by a jury in the circuit court of Massac County and was sentenced to death. The case is before us on direct appeal. Ill. Const. 1970, art. VI, sec. 4(b).

Apart from the mental condition of the defendant at the time of the killings, the facts of this case are not disputed. The record indicates that Alan Greer enlisted in the Army in 1965 and was soon hospitalized, diagnosed as schizophrenic and, approximately half a year after his enlistment, was discharged. Since that time he has been treated at several Veterans Administration hospitals, receives a government pension for complete disability, and has been taking relatively large doses of the psychotropic drugs Thorazine, Valium and Artane under prescription. Testimony also indicated that defendant would become "wild" when he drank while taking the drugs.

On January 21, 1978, defendant spent much of the day in a tavern in Joppa drinking whiskey and beer. At approximately 5 p.m. he left the tavern to go home and feed his pigs. Before leaving the tavern, however, he allegedly said that he was going home to "beat the hell out of my old lady."

After defendant arrived home and fed his pigs he argued with his girlfriend, Sharon Moss, who had been living with him. He then beat her with his fists, kicked her with his feet, and struck her repeatedly with a broomstick which broke during the course of the beating. The evidence does not establish clearly when Sharon Moss died. Defendant knew he had injured her severely and

tried to care for her that evening, but by the next morning when he summoned help she was dead. A pathologist testified that she died as a result of the beating. He also testified that the gestational age of the fetus she carried was approximately 8½ months, that the fetus died from the effects of the beating, and that its death occurred either within a few hours before, or at the death of, Sharon Moss.

At trial defense counsel attempted to prove that defendant was insane at the time of the killing, but objections to the proffered opinions of clinical psychologists were sustained by the trial judge. Instructions were given the jury on insanity and intoxication defenses, however, and defense counsel argued extensively as to both.

The State decided to seek the death penalty, and the defendant elected to proceed without a jury. At the sentencing hearing the trial judge concluded that the State had proved beyond a reasonable doubt that the defendant had taken two lives with the intent to kill (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)(3)). The court also decided that the defendant's three prior misdemeanor convictions precluded a finding that Greer did not have a significant history of prior criminal activity (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(c)(1)). Further, the court concluded that defendant was not under the influence of extreme mental or emotional disturbance when he committed the murders (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(c)(2)). Having found that the State had proved an aggravating factor beyond a reasonable doubt and that none of the statutory mitigating factors were present, the trial judge imposed the death sentence.

Defendant raises in this appeal a multitude of contentions of which only the following need be considered: (1) whether the killing of a fetus may constitute murder under Illinois law; (2) whether the death penalty was properly imposed, given the facts in this case; (3) whether the introduction of evidence concerning the death of the

fetus constituted reversible error; (4) whether the State's Attorney committed reversible error by mentioning in his opening statement the defendant's attempt to enter a guilty plea at arraignment; (5) whether the State's failure to provide defense counsel with the substance of an oral statement by the defendant requires reversal; and (6) whether the defendant received effective assistance of counsel at trial. Our decisions on these questions render the defendant's other contentions moot.

Whether the killing of an unborn fetus may constitute murder is a question of first impression in Illinois. Although this court held in *People v. Ryan* (1956), 9 Ill. 2d 467, 471, that the *corpus delicti* for infanticide includes proof that the child was born alive, that holding does not dispose of this case for in *Ryan* the acts that allegedly constituted homicide followed the birth of the child. The defendant contended that the infant had been stillborn and therefore was already dead when the acts were performed so that the State had the burden of proving that the child had been alive when the defendant acted. In the instant case, however, the pathologist's testimony indicates that the fetus was alive when Greer attacked Sharon Moss, and Greer does not question that point. The issue, therefore, is whether the commission of acts which result in the death of a fetus before its birth may constitute murder.

The answer to that question depends upon the proper construction of the homicide statute. Section 9—1(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(a)) provides that "[a] person who kills an individual without lawful justification commits murder ***." The use of the word "individual" rather than "person" to designate the victim is not significant; the two words are synonomous, and the drafters merely used one to designate the perpetrator and the other to designate the victim in order to avoid confusion. (Ill. Ann. Stat., ch. 38, par. 9—1, Committee Comments, at

17 (Smith-Hurd 1979).) The committee comments, however, also indicate that section 9—1(a) codifies the common law and the prior decisions of this court. (Ill. Ann. Stat., ch. 38, par. 9—1, Committee Comments, at 13, 17 (Smith-Hurd 1979).) Since this court has not considered previously the question now before us, we must turn to the common law to determine whether an unborn fetus is an "individual" within the meaning of our homicide statute.

At common law the killing of a fetus was not murder unless the child was born alive and then expired as a result of the injuries previously sustained. (3 Coke, Institutes *50; 1 Blackstone, Commentaries *129-30; 1 Hale, Pleas of the Crown 433 (1800).) This rule may produce apparently incongruous results depending on the precise time when the fetus expires. If the fetus survives long enough to be born and take a single breath, the defendant committed homicide. If, however, the fetus expires during birth, or just before, homicide has not occurred. Some States have avoided this anomaly by expressly including a fetus within the definition of victims of homicide or by passing a separate feticide statute. (See, *e.g.,* Cal. Penal Code sec. 187 (Deering 1971); Mich. Comp. Laws Ann. sec. 750.322 (1968).) In the absence of such a legislative enactment, however, no court of last resort in this country has held that the killing of a fetus is murder unless the fetus is born alive and then expires. See, *e.g., Keeler v. Superior Court* (1970), 2 Cal. 3d 619, 470 P.2d 617, 87 Cal. Rptr. 481; *State v. Gyles* (La. 1975), 313 So. 2d 799; *State v. Brown* (La. 1979), 378 So. 2d 916; *State v. Dickinson* (1971), 28 Ohio St. 2d 65, 275 N.E.2d 599; *Morgan v. State* (1923), 148 Tenn. 417, 256 S.W. 433; *State v. Larsen* (Utah 1978), 578 P.2d 1280.

The State contends, however, that the born-alive rule developed in the common law simply reflected the inadequacies of contemporary medical knowledge. Given the high infant mortality rates prevalent in the 18th

century and the lack of medical knowledge, the judges who formulated the common law were unwilling to consider the killing of a fetus murder and rationalized that result by creating a presumption that the fetus would die in childbirth. (*Keeler v. Superior Court* (1970), 2 Cal. 3d 619, 643, 470 P.2d 617, 633, 87 Cal. Rptr. 481, 497 (Burke, J., dissenting), citing Atkinson, *Life, Birth, and Live-birth,* 20 L.Q. Rev. 134 (1904).) Although the killing of a fetus was not homicide at common law, the abortion of a quickened child was punished as a "great misprision." (3 Coke, Institutes *50; 1 Blackstone, Commentaries *129-30.) The common law also protected the rights of the unborn child in a variety of other ways. The unborn child could take property by devise and intestate succession, and the child was considered a life in being for purposes of the Rule Against Perpetuities. (Louisell, *Abortion, The Practice of Medicine and the Due Process of Law,* 16 U.C.L.A. L. Rev. 233, 235 (1969).) Moreover, Blackstone maintained that as a general proposition "[l]ife *** begins in contemplation of law as soon as an infant is able to stir in the mother's womb." (1 Blackstone, Commentaries *129.) The State argues that the medical basis for the common law's reluctance to punish as murder the killing of a fetus no longer exists today. A fetus which has reached the stage of viability, generally thought to be about six months of age, has a high probability of survival upon premature birth. Modern medicine regards the fetus as a distinct individual since it has a separate circulatory system which does not intermix with the mother's. The State concludes therefore that a fetus which has reached the age of viability should be protected by the homicide statute.

To illustrate its argument that the advances in medical knowledge during the last 100 years require that a viable fetus be recognized as an independent human being, the State points to the development of tort law in this century. In the last century and during the greater part

of the first half of this century American courts uniformly refused either to allow a child to sue for injuries sustained before birth or to allow the survivors to maintain a wrongful death action based on the death of a fetus. (See, *e.g.,* *Dietrich v. Northampton* (1884), 138 Mass. 14; *Allaire v. St. Luke's Hospital* (1900), 184 Ill. 359; see also W. Prosser, Torts sec. 55 (4th ed. 1971) and cases cited therein; Louisell, *Abortion, The Practice of Medicine and the Due Process of Law,* 16 U.C.L.A. L. Rev. 233, 240-43 (1969), and cases cited therein.) In *Allaire,* Mr. Justice Boggs, dissenting, marshaled the medical evidence for regarding a viable fetus as a human being (*Allaire v. St. Luke's Hospital* (1900), 184 Ill. 359, 368-74 (Boggs, J., dissenting)) and most of the States in the country, including this one, have subsequently adopted his reasoning. (See W. Prosser, Torts sec. 55 (4th ed. 1971) and cases cited therein.) This court in particular has allowed a child to sue for prenatal injuries (*Renslow v. Mennonite Hospital* (1977), 67 Ill. 2d 348), and, more importantly, has allowed a wrongful death action for the death of a fetus due to injuries sustained while the fetus was viable (*Green v. Smith* (1978), 71 Ill. 2d 501; *Chrisafogeorgis v. Brandenberg* (1973), 55 Ill. 2d 368). The State argues that the same problems which underlay the reluctance at the common law to consider the killing of a fetus as murder were also the basis of a similar reluctance to extend tort remedies to encompass prenatal injuries. Since this court has discounted those problems in the tort area and has held that a viable fetus is a "person" within the meaning of the Wrongful Death Act (Ill. Rev. Stat. 1977, ch. 70, pars. 1, 2), the State argues that we should also recognize that a viable fetus is an "individual" under the homicide statute.

The State also contends that the legislature intended to protect viable fetuses under the homicide statute. The State's reasoning is twofold. First, many of the developments in tort law protecting the viable fetus, as well as

significant medical advances, had occurred by 1961 when the General Assembly enacted the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, pars. 1—1 to 43—2). The General Assembly must have been aware of these developments and, consequently, must have considered a viable fetus to be a human being protected by the homicide statute. Second, the General Assembly has declared in section 1 of the Illinois Abortion Law of 1975 (Ill. Rev. Stat. 1977, ch. 38, par. 81—21) that "the unborn child is a human being from the time of conception and is, therefore, a legal person for purposes of the unborn child's right to life and is entitled to the right to life from conception under the laws and Constitution of this state."

Although the arguments advanced by the State have considerable merit, we cannot concur in its conclusion. The extent to which the unborn child is to be accorded the legal status of one already born is one of the most debated questions of our time, and one to which we do not find any completely consistent response. As the State points out, the protections and remedies of tort law have expanded to include the unborn, sometimes subject to a viability standard and other times not. Doubtlessly the unborn also enjoy substantial rights under the law of property. On the other hand the United States Supreme Court has held that the unborn, whether or not viable, are not persons protected by the fourteenth amendment to the United States Constitution. (*Roe v. Wade* (1973), 410 U.S. 113, 158, 35 L. Ed. 2d 147, 180, 93 S. Ct. 705, 729.) Furthermore, a woman's constitutional right to privacy prevents the State from interfering with her decision to abort a previable fetus, even though that decision ordinarily results in its death. *Roe v. Wade* (1973), 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705.

Equally significant, these opposing tendencies to protect the fetus in some instances and not in others have long coexisted. The common law that protected certain property rights of the fetus also declined to apply

the penalties for homicide to one who destroyed the fetus. As earlier noted, American courts which have extended the benefits of tort law to fetuses have also, in the absence of specifically inclusive statutory language, uniformly refused to change the born-alive rule in criminal cases, four of them within the last 10 years. We do not imply that this divergence between tort law and criminal law is necessarily inconsistent. Differing objectives and considerations in tort and criminal law foster the development of different principles governing the same factual situation. W. Prosser, Torts sec. 2 (4th ed. 1971); W. LaFave & A. Scott, Criminal Law sec. 3, at 11-13 (1972).

Although, as earlier indicated, the State's argument that the intentional destruction of a viable fetus should be included in the definition of murder might well be adopted by the General Assembly, the fact is that a contrary intent is manifest. The clearest example of this intent lies in sections 5 and 6 of the Illinois Abortion Law of 1975 (as amended by "An Act to amend *** the 'Illinois Abortion Law of 1975' ***," enacted October 30, 1979) (hereinafter cited as the Act). Section 6(2) provides: "The law of this state shall not be construed to imply that any human being aborted alive is not an individual under the 'Criminal Code of 1961' ***." The killing of a fetus aborted alive may, therefore, be punished as murder under section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—1). Although the killing of fetus aborted alive may be punished as murder, none of the other offenses created by the Act may be punished as anything more than a Class 2 felony. Thus, section 5(2) of the Act punishes the intentional performance of an abortion on a viable fetus as a Class 2 felony, even if the abortion kills the fetus. Similarly, if a physician intentionally terminates a pregnancy knowing that the fetus is viable and the fetus dies because the physician intentionally failed to take the life-support

measures that would be employed if the fetus were intended to be born rather than aborted, then the physician is criminally culpable but only to the extent of a Class 2 felony, not murder, under section 6(1) of the Act.

If the General Assembly was aware when it enacted our homicide statute that the unborn enjoy extensive rights in the law of tort and property, it was also aware that under the common law and the decisional law of this country the crime of homicide does not encompass causing the death of a fetus unless the fetus is born alive and subsequently expires. Nevertheless, the General Assembly declined to specifically include the unborn within the potential victims of homicide or to create a separate offense of feticide. We cannot alter that decision or create a new offense. (Ill. Rev. Stat. 1977, ch. 38, par. 1—3.) After considering the status of the unborn in the common law, the uniform decisions of the courts of last resort in our sister States, and the attitude toward the unborn reflected in our abortion statute, we conclude that taking the life of a fetus is not murder under our current statute unless the fetus is born alive and subsequently expires as a result of the injuries inflicted.

Also an issue here is the propriety of the death penalty. Predicated on the failure of the proof to establish that defendant intended to kill two people (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)(3)) and the effect upon him of an extreme mental or emotional disturbance (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(c)(2)), the State has confessed error as to the death penalty. While that confession does not bind us, we need not consider its propriety here since we have decided that the killing of a fetus may not constitute murder. That conclusion removes from this case the multiple-murder aggravating factor (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)(3)) relied upon by the trial court and precludes imposition of the death penalty.

The third question before us is whether the introduction of evidence concerning the death of the fetus was so

prejudicial as to deny the defendant a fair trial. That evidence consisted of the testimony of the pathologist concerning the age, development, and cause of death of the fetus, and the introduction of a slide showing the fetus still within the uterus which had been removed and cut open to reveal the fetus. Ordinarily it is the function of the trial judge to weigh the probative value and potential prejudicial effect of such evidence and his decision will not be reversed absent an abuse of discretion. (*People v. Myers* (1966), 35 Ill. 2d 311, 331; *People v. Kolep* (1963), 29 Ill. 2d 116, 124; *People v. Jenko* (1951), 410 Ill. 478, 482.) Even assuming that none of this evidence was admissible for any purpose other than the improper one of showing the death of the fetus, a new trial is not required unless the defendant has been prejudiced (*People v. Speck* (1968), 41 Ill. 2d 177, 202-03, *rev'd as to death penalty* (1971), 403 U.S. 946, 29 L. Ed. 2d 855, 91 S. Ct. 2279; *People v. Jenko* (1951), 410 Ill. 478, 482). We do not believe that prejudice has been established. It would have been very difficult to try this case without revealing the death of the fetus. The admissible testimony and photographic evidence concerning the death of Sharon Moss clearly indicated that she was very near the end of her pregnancy and that the child she carried had not survived. This information would have reached the jury even if evidence directly concerning the fetus had not been presented. The slide in question was only one of nine items of photographic evidence presented at the trial, and by no means the most gruesome among the group. The other items demonstrated the cause of Sharon Moss' death and the degree of force used against her (*People v. Kolep* (1963), 29 Ill. 2d 116, 124; *People v. Jenko* (1951), 410 Ill. 478, 482; *People v. Kirkpatrick* (1979), 70 Ill. App. 3d 166, 176), and their admissibility is not challenged. We simply do not believe that the slide of the fetus had any appreciable effect beyond that engendered by the admissible evidence relating to the

death of Sharon Moss.

Defendant also urges that the State's Attorney's opening statement, which informed the jury that the defendant had once attempted to plead guilty, denied him a fair trial. The defendant, without the advice of counsel, attempted to plead guilty at his arraignment, but the judge refused to accept the plea and appointed counsel to represent him. The record does not contain a statement by the judge indicating the reason he refused to accept the guilty plea, but the defendant's statements at arraignment raised the possibility of incompetence at that time, and also indicated potential defenses of intoxication and insanity. In his opening statement the prosecutor said that defendant had attempted to plead guilty, that he admitted that he had killed Sharon Moss, and that he would probably raise the defense of insanity. Defense counsel objected and unsuccessfully moved for a new trial. A subsequent effort to introduce a transcript of the arraignment to show the attempt to plead guilty was denied.

Informing the jury of a prior guilty plea which the court has either rejected or allowed the defendant to withdraw violates our Rule 402(f) (73 Ill. 2d R. 402(f)) and is to be condemned. Ordinarily, when the commission of the alleged acts by the defendant is disputed, any mention by the prosecution of a previously withdrawn or rejected guilty plea would require a new trial. (*Cf. People v. Bain* (1973), 10 Ill. App. 3d 909; *People v. Haycraft* (1966), 76 Ill. App. 2d 149.) Here, however, it was undisputed that defendant killed Sharon Moss, the only issue being whether he was criminally responsible for his acts. At the same time that the prosecutor informed the jury of the defendant's rejected guilty plea he also said that the defendant admitted killing Sharon Moss and said he wanted help and that the defendant was raising an insanity defense. The import of these statements is that the defendant admitted the acts but denied responsi-

bility. We do not believe that this denied him a fair trial.

It is also argued that the prosecution's failure to comply with our discovery rules entitles the defendant to a new trial. The trial court granted the defendant's pretrial discovery motion which requested, *inter alia*, the substance of any oral statements made by the defendant and known to the State and a list of witnesses to such statements. (65 Ill. 2d R. 412(a)(ii).) The State knew that Linda Lewis was present in the tavern where the defendant had been drinking on the day of the killing and also knew that she claimed that the defendant had said that he had to get home before dark to feed his pigs and that he intended to go home and "beat the hell out of his old lady." The State provided Linda Lewis' name in a list of potential trial witnesses but did not provide the substance of the above statements. Nor did it indicate any knowledge of oral statements by the defendant or that Linda Lewis was a witness to them. Linda Lewis subsequently married, changing her name to Linda Creemens, and the State listed her under the new name among the State's potential trial witnesses in an amended list five days before trial.

In his opening statement, the prosecutor said that he would introduce testimony that the defendant, before leaving the tavern in Joppa, said he was going home to feed his pigs before dark. The defendant objected and moved for a mistrial, which the trial judge denied. The prosecutor then offered to let the defendant interview Creemens before she took the stand, but he declined, saying that such a hasty interview was not an adequate substitute for a thorough investigation of the alleged statement. Linda Creemens testified as the State's first witness to the earlier-quoted statement by defendant, who again sought a mistrial which was denied. In his closing argument, the prosecutor referred to Creemens' testimony.

The defendant was clearly entitled to the substance of

this oral statement, and a list of the witnesses to it (65 Ill. 2d R. 412(a)(ii)); *People v. Szabo* (1977), 55 Ill. App. 3d 866, 871), but failure to provide them does not in all instances necessitate a new trial. Noncompliance with discovery requirements does not require reversal absent a showing of prejudice. (*People v. Steel* (1972), 52 Ill. 2d 442; *People v. Raby* (1968), 40 Ill. 2d 392; *People v. Welch* (1961), 22 Ill. 2d 558.) We are not concerned here with a failure to disclose potentially exculpatory evidence (see, *e.g., People v. Nichols* (1976), 63 Ill. 2d 443), nor does the undisclosed statement contradict the defendant's testimony (see, *e.g., People v. Szabo* (1978), 55 Ill. App. 3d 866). Defendant presented no evidence of circumstances pertaining to the statement which would render it inadmissible. The only prejudice suggested by the defendant is that the nondisclosure of the statements prevented him from investigating Linda Creemens' reliability as a witness and from interviewing the other witnesses present at the tavern to ascertain whether anyone else had heard the statements. However, defendant had been given Linda Lewis' name and the names of the others present at the tavern several months before the trial, and her married name five days beforehand, so that there was ample opportunity to interview those persons prior to trial. Defendant has made no effort to demonstrate that any of the other persons present at the tavern would have contradicted Linda Creemens' testimony. (*Cf. People v. O'Hara* (1928), 332 Ill. 436, 466.) Finally, Creemens' testimony was not essential to support the defendant's conviction. (See, *e.g., People v. Coslet* (1977), 67 Ill. 2d 127.) Considering these circumstances, we believe the defendant's claims of prejudice too nebulous to justify a new trial.

The final question is whether the defendant received effective assistance of counsel. The inadequacy of a defendant's trial counsel entitles him to a new trial if his appointed counsel was actually incompetent, as reflected

in the performance of his duties as trial attorney, and if this incompetence produced substantial prejudice to the defendant without which the result of the trial would probably have been different. (*People v. Goerger* (1972), 52 Ill. 2d 403; *People v. Dudley* (1970), 46 Ill. 2d 305; *People v. Georgev* (1967), 38 Ill. 2d 165; *People v. Morris* (1954), 3 Ill. 2d 437.) The defendant urges that we replace this standard with one which requires that the defendant's trial representation satisfy "minimum professional standards for reasonably competent representation." A number of the Federal courts of appeal have adopted a similar standard (see, *e.g., Cooper v. Fitzharris* (9th Cir. 1978), 586 F.2d 1325; *United States v. Bosch* (1st Cir. 1978), 584 F.2d 1113; *United States ex rel. Williams v. Twomey* (7th Cir. 1975), 510 F.2d 634), but the latest to consider the question declined to do so (*United States v. Decoster* (D.C. Cir. July 10, 1979) (*en banc*), 25 Crim. L. Rptr. 2365, 48 U.S.L.W. 2070, *cert. denied* (1979), 444 U.S. 944, 62 L. Ed. 2d 311, 100 S. Ct. 302), and the United States Supreme Court has declined to address the issue. We considered this question most recently in *People v. Murphy* (1978), 72 Ill. 2d 421, and refused to change our standard. As we have stated previously, a defendant is entitled to competent, not perfect, representation (*People v. Berland* (1978), 74 Ill. 2d 286), and we do not believe that the Constitution requires a new trial for every defendant whose counsel errs at trial, particularly in the absence of a demonstration that the outcome of a new trial would probably be different. We therefore reaffirm our standard set forth above.

The defendant argues alternatively that he is entitled to a new trial under our current standard. He specifies four instances which allegedly demonstrate the incompetence of his counsel. First, counsel did not introduce expert testimony at the competency and death penalty hearings. Since we have decided that the death penalty may not be imposed, we do not believe counsel's actions

at the death penalty hearing are significant. As for the competency hearing, we note that one of the two psychologists employed by defense counsel thought that the defendant was sane when the psychologist interviewed him. The record does not indicate what opinion the other psychologist had concerning the defendant's sanity at the time of trial. Under these circumstances, the decision whether to introduce that expert testimony at the competency hearing, assuming its admissibility, was a question of strategy which we will not review. *People v. Skorusa* (1973), 55 Ill. 2d 577.

The second instance cited by the defendant is the failure to object to two statements by the prosecutor in his closing argument. The first statement—that the defense had not presented any expert evidence saying he was insane—was technically correct and an objection could have properly been overruled (*People v. Williams* (1968), 40 Ill. 2d 522; *People v. Norman* (1963), 28 Ill. 2d 77). The second statement told the jury that if they returned a verdict of not guilty by reason of insanity and it is decided that the defendant had recovered, then he would go free. Later in his closing the prosecutor returned to that theme, arguing that the defendant should not be set free to repeat his crimes. We do not believe that the defense counsel's handling of these statements demonstrates actual incompetence. Defense counsel did object to the prosecutor's first reference to the effect of a verdict of not guilty by reason of insanity. The trial court sustained the objection and instructed the jury to disregard the remark. The failure to object to the second reference may have been a tactical decision which we will not review. (*People v. Newell* (1971), 48 Ill. 2d 382; *People v. Martin* (1970), 44 Ill. 2d 489; *People v. Dean* (1964), 31 Ill. 2d 214; *People v. Wesley* (1964), 30 Ill. 2d 131.) The defendant argues alternatively that these remarks were so prejudicial as to constitute plain error. The remark concerning the expert

testimony was not error since it was true. Moreover, the trial judge instructed the jury to disregard the prosecutor's remarks concerning a verdict of not guilty by reason of insanity. We do not believe reversal is required.

The third instance of incompetence alleged by defendant is the failure of counsel to interview all witnesses before the trial and his consequent ignorance concerning the nature of Linda Creemens' testimony. The failure to interview witnesses may indicate actual incompetence (*People v. Witherspoon* (1973), 55 Ill. 2d 18), particularly when the witnesses are known to trial counsel and their testimony may be exonerating (*People v. Stepheny* (1970), 46 Ill. 2d 153). In this case, however, the defendant does not point to any potentially favorable testimony which his trial counsel failed to investigate, nor does defendant contend that anyone would have contradicted the testimony of Linda Creemens, or that her testimony could have been excluded. Although defense counsel may have been surprised by Creemens' testimony, there has been nc showing of a prejudicial effect without which the outcome of the trial would probably have been different.

The final instance of alleged incompetence is defense counsel's failure to introduce psychiatric testimony at trial concerning the defendant's mental condition. Defense counsel procured clinical psychologists to testify concerning the defendant's mental condition, but the trial court, relying on *People v. Noble* (1969), 42 Ill. 2d 425, refused to allow them to express an independent expert opinion on the defendant's sanity. Counsel sought to have the psychologists express their opinion as lay witnesses, but the trial court held a proper foundation had not been laid. Although the psychologists were not allowed to express an opinion, one of them testified as to the matters he would have used as a basis for his opinion. He recounted the defendant's history of psychological problems and prescribed drug use, the defendant's appearance

and mannerisms during interviews, and the effect of alcohol upon an individual with the defendant's medical history and drug use.

Defense counsel also introduced considerable testimony by lay witnesses concerning the defendant's character and his tendency to fly into rages, as well as the defendant's medical record, and the trial judge instructed the jury on the insanity defense. Considering the evidence that was introduced, together with the argument and instructions, we believe that defendant has not sufficiently shown that the outcome of the trial would probably have been different had psychiatric testimony been introduced. The State had the burden of proving the defendant sane once the defendant has properly raised an issue as to his sanity. (Ill. Rev. Stat. 1977, ch. 38, pars. 3—2, 6—4.) Expert testimony is not necessary to raise that issue. *People v. Childs* (1972), 51 Ill. 2d 247; *People v. Manning* (1978), 61 Ill. App. 3d 558; *People v. Lono* (1973), 11 Ill. App. 3d 443.

In short, defendant has not shown that his trial counsel was actually incompetent. Despite the questionable decisions concerning expert testimony and interviewing witnesses, the record in this case reveals that defense counsel represented his client vigorously and, on the whole, sufficiently ably to preclude a finding of incompetency.

We therefore affirm the judgment of the circuit court of Massac County insofar as it found defendant guilty of the murder of Sharon Moss, reverse that judgment insofar as it found defendant guilty of the murder of baby girl Moss, vacate the death sentence, and remand the cause to the trial court for resentencing.

*Affirmed in part and reversed in part; sentence vacated; cause remanded.*

MR. JUSTICE CLARK, concurring in part and dissenting in part:

I concur in affirming the conviction for the murder of Sharon Moss, but I must dissent from the reversal of the conviction for the murder of the fetus. The essential question here is when a fetus becomes a human being so that it is entitled to protection under the law. This question is certainly no stranger to controversy. At various times in history it has been promoted as doctrinal truth that humanity attaches at conception (immediate animation), at quickening (mediate animation) and at birth (animation at birth). (Means, *The Law of New York Concerning Abortion and the Status of the Foetus, 1664-1968: A Case of Cessation of Constitutionality,* 14 N.Y.L.F. 411, 416 (1968).) No single view has achieved total acceptance in the law at any one time, and any harmony of thought seems remote in our time. However, it is not necessary to plumb the depths of one's reason to reach the conclusion that it is wrong for there to be such a sizeable gap in our criminal law that a person may destroy a viable, 8½-month-old fetus with impunity. Even *Roe v. Wade* (1973), 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705, the decision which legalized abortion to a limited extent, contained the restriction that, once viability occurs, the State may proscribe all abortions except those necessary to preserve the life or health of the mother. (410 U.S. 113, 163-64, 35 L. Ed. 2d 147, 183, 93 S. Ct. 705, 732; see generally, Gorby, *The "Right" to an Abortion, the Scope of Fourteenth Amendment "Personhood," and the Supreme Court's Birth Requirement,* 1979 S. Ill. U.L.J. 1.) The reasoning of the court was that, once the fetus is viable, that is, able to live or survive apart from its mother (Schmidt, Attorneys' Dictionary of Medicine 870, cited in *Keeler v. Superior Court of Amador County* (1970), 2 Cal. 3d 619, 641, 470 P.2d 617, 631, 87 Cal. Rptr. 481, 495 (Burke, J., dissenting); accord, Illinois Abortion Law of 1975 (Ill. Rev. Stat. 1977, ch. 38, par. 81–22(2))), the State's interest in potential life is compelling. I believe the viability argument takes on even

greater force in the instant context, where a violent attack was made which destroyed the fetus. Such an attack should be punishable as murder.

What I find to be particularly puzzling is that the majority discusses at length the persuasive arguments of the State as to why this fetus should be considered to be a human being, concedes that there is "considerable merit" to these arguments, but then rejects the conclusion to be drawn from them. The majority instead states that if the General Assembly intended to make the destruction of a viable fetus murder, it could have so specified in the Illinois Abortion Law of 1975. But we are not dealing with an abortion in this case. We are not dealing with the intentional termination of a pregnancy by the use of any instrument, medicine, drug or any other substance or device (Ill. Rev. Stat. 1977, ch. 38, par. 81–22(6)), that is, as a medical procedure, performed by a physician and with the consent of the woman. Rather, we are here concerned with a violent attack upon the person of a woman who had carried a fetus for 8½ months, to the point where the fetus was fully viable. The General Assembly did not intend to provide for the instant situation in the Illinois Abortion Law of 1975, so of course there is no explicit statutory section which defines the acts involved here as murder. That does not mean, however, that the Illinois Abortion Law of 1975 is of no assistance in understanding the intent of the General Assembly as to the precise issue involved here. On the contrary, section 1 of the Act is of vast aid. It provides in relevant part:

> "Without in any way restricting the right of privacy of a woman or the right of a woman to an abortion under [*Roe v. Wade* (1973), 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705, and *Doe v. Bolton* (1973), 410 U.S. 179, 35 L. Ed. 2d 201, 93 S. Ct. 739], the General Assembly of the State of Illinois do solemnly declare and find in reaffirmation of the longstanding policy of this State, that the unborn child is a human being from the time of conception and is, therefore, a legal person for purposes of the unborn child's

right to life and is entitled to the right to life from conception under the laws and Constitution of this State." Ill. Rev. Stat. 1977, ch. 38, par. 81—21.

Notwithstanding this clear and unequivocal statement, the majority concludes that because the Supreme Court has said that a fetus is not a person for fourteenth amendment purposes and because the Illinois Abortion Law of 1975 does not provide for this precise factual situation, there is no manifestation that the General Assembly intended to punish the destruction of a fetus as murder. The majority fails to realize that the Supreme Court's statement does not prohibit the States from making separate and different statutory rules which do bestow status as a person upon a fetus. That, of course, is precisely what the General Assembly did in this State when it passed legislation bestowing upon unborn children, through guardians or other personal representatives, the right to life (Illinois Abortion Law of 1975 (Ill. Rev. Stat. 1977, ch. 38, par. 81—21)); the right to own property (Ill. Rev. Stat. 1977, ch. 83, par. 12.1); and the right to maintain actions and recover damages for wrongful death (Pub. Act 81—946, effective January 1, 1980, adding section 2.2 to the Wrongful Death Act (Ill. Rev. Stat. 1977, ch. 70, par. 1 *et seq.*).) It seems clear then that the General Assembly did intend to extend the protection of the law, including the criminal law, to the unborn. Extending the protection of the criminal law to, at the least, viable fetuses, would in no way infringe upon the mother's right to privacy which was the linchpin of the decision in *Roe v. Wade*. It was stated there that the right to privacy is not absolute; it does not extend to the third trimester, when the fetus is presumed to become fully viable. 410 U.S. 113, 163-64, 35 L. Ed. 2d 147, 183, 93 S. Ct. 705, 732.

Thus, I think the destruction of the fully viable fetus in this case constituted murder. To hold otherwise is to resolve a doubt against the preservation of fetal life rather

than in favor of it. To hold otherwise also absolves the defendant herein of any wrongdoing, although he cruelly denied a viable fetus, with the unbounded potential for life, of the opportunity to enjoy what rightfully belonged to it. I do not think the law of Illinois should countenance such a result.

MR. JUSTICE MORAN, concurring in part and dissenting in part:

For all applications within the Criminal Code of 1961, the legislature defined "person" as "an individual ***." (Ill. Rev. Stat. 1977, ch. 38, par. 2—15, effective Jan. 1, 1962.) Within the Criminal Code, the legislative intent is clear. Therein, the General Assembly, in 1975, reaffirmed the long-standing public policy which recognizes the fetus, from conception, as a human being and a legal person for purpose of a right to life. (Ill. Rev. Stat. 1977, ch. 38, par. 81—21.) The sole exception to this policy was expressly—and reluctantly—carved out for the abortion provision mandated by the United States Supreme Court ruling in *Roe v. Wade* (1973), 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705. It is my opinion that, but for the single exception, the public policy of this State has recognized and continues to recognize a fetus as a human being, a person, an individual.

From its inception, section 9—1(a) of article 9 (Homicide) of the Criminal Code of 1961 (Ill. Rev. Stat. 1961, ch. 38, par. 9—1(a)) states:

"A person who kills an *individual* without lawful justification commits murder ***." (Emphasis added.)

With clear expression that a fetus is an individual, then, one who kills a fetus, without lawful justification and outside the exception of the abortion statute, can be charged with and found guilty of murder. This is particularly true in the circumstances of the instant case where the viability of the 8 1/2-month-old fetus was unquestioned and where the evidence, in fact, showed Baby Girl Moss to

be alive at the time defendant attacked Sharon Moss. I would therefore affirm the defendant's conviction for the murder of Baby Girl Moss.

Under the facts here, however, I would vacate the death penalty. In the information pertinent to Baby Girl Moss, the defendant was charged in three counts with the violation of sections 9—1(a)(1), (a)(2) and (a)(3) (Ill. Rev. Stat. 1977, ch. 38, pars. 9—1(a), (b), (c)). He was not charged under section 9—1(b), which contains the requisite conditions for the imposition of death. The State, in fact, has confessed error in this regard and admits that, because defendant was not charged under section 9—1(b), the death penalty should be vacated.

I would therefore affirm the judgments of the circuit court finding defendant guilty of the murders of Sharon Moss and Baby Girl Moss, vacate the death sentence and remand the cause to the trial court for defendant's re-sentencing.