(No. 57152.— ▮▮▮▮▮▮▮▮▮▮▮▮▮▮)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JAMES ROYSE, Appellant.

*Opinion filed December 16, 1983.*

Louis B. Garippo, of Louis B. Garippo, Ltd., of Chicago (Susan G. Feibus, of counsel), for the appellant.

Tyrone C. Fahner and Neil F. Hartigan, Attorneys General, of Springfield (Michael B. Weinstein, Darrell Panethiere, and Terence M. Madsen, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE CLARK delivered the opinion of the court:

Defendant, James C. Royse, was arrested on January 10, 1980, and charged with unlawful delivery of more than 30 grams of a controlled substance, cocaine (Ill. Rev. Stat. 1979, ch. 56½, par. 1401(a)(2)). Defendant was convicted on November 14, 1980, and a motion for a new trial was denied on January 22, 1981. A divided appellate court affirmed the circuit court of Williamson County (107 Ill. App. 3d 326), and we granted defendant's petition for leave to appeal (87 Ill. 2d R. 315(a)).

Defendant, James Royse, was residing at 238 McNeil, Carterville, Illinois, when he was arrested by agents of the Southern Illinois Enforcement group. Also residing at that address were codefendant, Kevin Young, and his girlfriend, Debbie Clinton. Royse had moved to the 238 McNeil address in November of 1979, and had paid Young $80 a month rent, plus a portion of the utilities. Royse had moved there at the invitation of Debbie Clinton because she felt it would be more economical for three people to share living expenses.

In December of 1979, undercover agents Bruce Town-

send and William Mehrtens visited 238 McNeil to inquire about the availability of drugs. The first time agent Mehrtens visited the address was on December 11, 1979, when he purchased four blotter squares of LSD from Young. Mehrtens made arrangements to purchase more LSD two days later. When Mehrtens returned on December 13, 1979, Royse answered the door. Mehrtens and Royse provided conflicting accounts of the subsequent transaction. Mehrtens testified that Royse stated Young was not home, and that Mehrtens told Royse that he had arranged a purchase of LSD for that night. Royse went to the kitchen and returned with the LSD. He took the money and indicated that he would give it to Young. Mehrtens testified at the preliminary hearing that Royse told him it was not his business, that he did not want anything to do with it, and that in the future, Mehrtens should talk to Young.

Royse testified that he told Mehrtens that "he could not help him at all," and that Mehrtens pressured him to get the LSD. Royse testified that Mehrtens was angry and that Young would also be angry if Royse "blew the deal" that Young had set up. Royse knew that Young was out of work and that Young would be mad if Royse did not get him some money. Royse testified that he went to a cabinet where he had seen Young store some papers. Royse brought papers labeled "LSD" to Mehrtens, and Mehrtens placed $32 on a table in exchange for the four blotter squares of LSD he found in the papers.

Undercover agent Townsend first visited 238 McNeil on December 19, 1979, and he returned there approximately six times between December 19, 1979, and January 9, 1980. At trial, Townsend testified that he and Mehrtens drove to 238 McNeil on January 9, 1980, and that he talked with Kevin Young. Young said he did not have any LSD, but that he had something else that

Townsend might be interested in. They went into the kitchen, and Young showed him a white, powdery substance that Young said was cocaine. Young said that he had three ounces available, and that the price was $500 per quarter ounce.

Townsend testified that he and Mehrtens returned to 238 McNeil Street later that day to obtain a "taster" of cocaine. Townsend and Mehrtens returned to Carbondale, where they performed a field test that reacted positively for the presence of cocaine. Townsend testified that he did not discuss the deal with Royse or Clinton, although they were present on January 9, 1980.

The two agents returned to 238 McNeil on January 10, 1980, at about 12:30 p.m. Mehrtens remained in the car with $4,500 in prerecorded bills while Townsend went into the house. Townsend testified that he asked Royse and Young whether it was "snowing" outside, referring to the availability of cocaine. Townsend testified that Royse and Young replied affirmatively. Townsend further testified that he said someone should come out to the car and count the money, and that Royse sat in the front seat of the agents' car and counted the money twice. Mehrtens and Townsend both testified that Royse drove away in his car to obtain the cocaine. They indicated that Royse returned with the cocaine and that Royse, Young, Mehrtens and Townsend completed the transaction in the kitchen at 238 McNeil.

Royse's version of the events leading up to the arrest is quite different from that provided by Townsend and Mehrtens. Royse testified that on January 10, 1980, he was in the back yard when agent Townsend arrived. When he went inside, he saw Townsend talking to Young, but sat down to watch television with Debbie Clinton. Young called out that he "needed someone to count the money." At that point, Royse realized Townsend was there to buy cocaine, and he said he did not

want to get involved. Royse testified that Townsend called him "a chicken sh--" and a "narc," and that Young threatened to throw him out of the house if he did not help. Royse was unemployed and owed Young $80, so he complied with Young's request. Royse told Townsend, "This is none of my business and I really don't want to get involved at all." When Royse returned to the house, Young gave him a packet of cocaine and told him to drive around for a short time so it would appear that the cocaine had not come from the house. When Royse returned, he threw the cocaine on Young's scale, claiming he had nothing to do with the deal, and left the room.

Young, Royse and Clinton were arrested after this transaction. Debbie Clinton pleaded guilty to a lesser charge of possessing less than 30 grams of cocaine and did not receive a prison sentence. Young forfeited bond and did not appear for trial. Young was tried *in absentia* under section 115—4.1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1979, ch. 38, par. 115—4.1). Royse was tried jointly with Young and asserted the defense of entrapment. The jury was instructed as to entrapment and accountability.

Before trial, Royse's lawyer received an offer of employment from the prosecutor. Defense counsel accepted the offer of employment shortly after Royse and Young were found guilty as charged. No conflict-of-interest question was presented on appeal to the appellate court or in this court, but defendant Royse was represented by different counsel at the sentencing hearing. After oral argument, the trial judge made the following statement:

> "I believe that the commission was probably facilitated and induced by the codefendant Young. The defendant has no history of prior criminal or delinquent misconduct, and I don't think such conduct would reoccur in this defendant. I think that his character and attitude, both at trial and today, are such that any future misconduct

would be very unlikely, and I find that there are no aggravating circumstances in this case. The deterrent effect of a sentence on a Class X offense, and this Class X offense, I think, is of little or no value as in my opinion the minimum in this case, as counsel has said, is far too great. The defendant in this case has been shown to be an aider and abetter, and as such he is raised to the level of a Class X felon. It is an offensive sentence, it is an unreasonable sentence and it is an unjustified sentence in this case, but it is the required sentence under the prevailing statute. As a result of which I am sentencing the defendant to six years in the custody of the Illinois Department of Corrections."

We now address the first issue presented for review, whether the trial court erred in denying defendant's motion for a new trial based on the distinction between the standard of competence for retained and appointed counsel. After defendant Royse was found guilty as charged, defendant's new counsel argued a motion for a new trial. While denying the motion, the trial judge stated:

"I have seen cases where counsel has done a worse job than the Defense counsel in this case. Not a lot, but I have seen some in major cases. The problem is, and if this were appointed counsel I would have no hesitancy in deciding that his conduct was so incompetent that this defendant should have a new trial."

Illinois courts have applied a two-tiered standard in cases where ineffective assistance of counsel is alleged. Representation by court-appointed counsel is constitutionally deficient if the incompetence produced substantial prejudice to the defendant without which the result would probably have been different. (*People v. Greer* (1980), 79 Ill. 2d 103, 120-21; *People v. Kubat* (1983), 94 Ill. 2d 437, 483; *People v. Carlson* (1980), 79 Ill. 2d 564, 584-85.) In the case of privately retained counsel, reviewing courts have not reversed a defendant's conviction "unless the representation is of such a low caliber as to amount to no representation at all or reduces the court proceedings to a

farce or a sham." *People v. Torres* (1973), 54 Ill. 2d 384, 391.

Illinois is one of the few jurisdictions that has continued to draw a distinction between appointed and retained counsel. (See Annot., 2 A.L.R.4th 27 (1980).) However, a recent United States Supreme Court decision has questioned the constitutionality of the two-tiered standard. In *Cuyler v. Sullivan* (1980), 446 U.S. 335, 344-45, 64 L. Ed. 2d 333, 344, 100 S. Ct. 1708, 1716, the Supreme Court stated:

> "A proper respect for the Sixth Amendment disarms [the State's] contention that defendants who retain their own lawyers are entitled to less protection than defendants for whom the State appoints counsel. *** [W]e see no basis for drawing a distinction between retained and appointed counsel that would deny equal justice to defendants who must choose their own lawyers."

The *Cuyler* decision involved a claim of conflict of interest, but the opinion did not limit its interpretation of sixth amendment rights to conflict-of-interest questions. The preservation of a two-tiered standard raises the possibility of a denial of equal protection (U.S. Const., amend. XIV, sec. 1; Ill. Const. 1970, art. I, sec. 2 (equal protection of laws made applicable to the States by the fourteenth amendment)) to individuals who choose their own attorneys. Defendants with appointed counsel would be afforded greater sixth amendment rights than those who chose their own attorneys. *People v. Long* (1973), 12 Ill. App. 3d 974, 979.

This court has not reviewed the two-tiered standard since *Cuyler,* but our appellate court opinions have interpreted *Cuyler* to apply the *Greer* test to both appointed and retained counsel. *People v. Lovitz* (1981), 101 Ill. App. 3d 704, 710; *People v. Talley* (1981), 97 Ill. App. 3d 439, 443; *People v. Scott* (1981), 94 Ill. App. 3d 159, 163; see also *People v. Haywood* (1980), 82 Ill. 2d 540, 543-44; *People v. Carlson* (1980), 79 Ill. 2d 564, 584-85.

Irrespective of whether a single standard is constitu-

tionally required by *Cuyler*, we have determined that a single standard should be followed henceforth in this State and that the standard of *People v. Greer* (1980), 79 Ill. 2d 103, 120-21, ought to apply to both court-appointed and retained counsel. To the extent that *People v. Torres* (1973), 54 Ill. 2d 384, is inconsistent with the standard enunciated here, we now overrule it.

We do not agree with the State's contention that changing the standard for effective assistance of counsel will open the floodgates for frivolous appeals. Trial judges and appellate judges are certainly capable of applying a single standard, rather than the two-tiered approach that was followed in the past. We therefore conclude that the trial judge should have granted defendant's motion for a new trial, and we now hold that the *Greer* standard should be applied in this and all future cases involving both retained and appointed counsel.

We now turn to the final three issues raised on appeal, which will be discussed together, since they are closely related. Defendant maintains that he was denied effective assistance of counsel. The right of a defendant in a criminal case to be assisted by counsel is guaranteed by the sixth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VI, XIV (sixth amendment right to counsel made applicable to the States by the fourteenth amendment); see *Argersinger v. Hamlin* (1972), 407 U.S. 25, 32 L. Ed. 2d 530, 92 S. Ct. 2006; *Gideon v. Wainwright* (1963), 372 U.S. 335, 9 L. Ed. 2d 799, 83 S. Ct. 792.) The United States Supreme Court has noted: "The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." *Glasser v. United States* (1942), 315 U.S. 60, 76, 86 L. Ed. 680, 702, 62 S. Ct. 457, 467.

Although the right to effective assistance of counsel is well established, a defendant is entitled to a fair trial, not a

perfect one. (*People v. Morris* (1954), 3 Ill. 2d 437, 448.) Courts have been reluctant to examine trial transcripts with microscopic detail in order to determine what a more competent attorney would have done under the same circumstances. An overly expansive reading of the right to counsel would transform the appellate courts of this country into a "super-legal-aid bureau." (*Uveges v. Pennsylvania* (1948), 335 U.S. 437, 450, 93 L. Ed. 127, 136, 69 S. Ct. 184, 190 (Frankfurter, J., dissenting).) See Waltz, *Inadequacy of Trial Defense Representation as a Ground for Post-Conviction Relief in Criminal Cases*, 59 Nw. U. L. Rev. 289 (1964); *cf.*, Note, *Inadequate Assistance of Criminal Trial Counsel: The Standards for Illinois* 47 Chi.-Kent L. Rev. 218, 225 (1970).

However, the case at bar presents a pattern of incompetence that transcends mere tactical decisions on evidentiary matters. Counsel for defendant objected only three times in the course of a three-day trial, while prosecution witnesses repeatedly gave damaging hearsay testimony, offered their opinions, summarized conversations without adequate foundation, and volunteered incriminating information about other drug transactions that were not the basis for the trial. Defendant asserts that the following are examples of defense counsel's incompetence: failure to move for a severance of trial from that of the absent defendant Young; failure to argue at the preliminary hearing; failure to move for a directed verdict after the State's case; failure to move for a mistrial after Deputy Townsend volunteered that defendant had been involved in unspecified other offenses; failure to follow up an attempted impeachment by use of a prior inconsistent statement; failure to object to the prosecutor's inquiry as to whether defendant planned on calling Debbie Clinton as a witness; failure to object to numerous leading questions and hearsay answers; failure to object to the agents' summarization of conversations with Young and Royse without specifying who was

present and who made the statements; failure to object to agents' testimony that described what Royse was thinking; and failure to object to Mehrtens' summary of conversations which occurred outside of Mehrtens' presence. Some examples are worthy of summarization:

"Q. And then what happened?

A. Mr. Young began to count the money and I entered into a drug related conversation with Debbie Clinton concerning the quality of the cocaine. She assured me that it was, in fact, good cocaine and so forth.

\* \* \*

Q. And you asked him, I believe you said, about a large purchase of LSD?

A. We had been talking about the purchase of LSD; LSD had been purchased there before.

\* \* \*

Q. Jim didn't say that, Mr. Young said that, isn't that true?

A. Mr. Young, Mr. Royse and myself were engaged in a conversation, in the house. When I asked how the transaction would go the next day, Mr. Young stated that Jim, referring to Mr. Royse, would go to obtain the cocaine. There was no doubt in my mind but what Mr. Royse knew fully what was going on.

Q. There's no doubt in your mind. Did Kevin Young consult with Miss Clinton or Mr. Royse about this transaction?

A. Yes, sir. I would say that he did.

\* \* \*

Q. Jim Royse didn't say 'Why don't you come back and do a few "lines" with us?'

A. Not that I recall. No, sir.

Q. Isn't it true, Mr. Townsend, that until the 10th of January, Jim Royse wasn't involved in this thing at all, other than being present in the house?

A. By 'thing,' I don't understand what you're —

Q. This whole negotiated sale of cocaine?

A. I had been advised by other Agents he was involved in separate transactions, which we have not discussed."

Such unresponsive hearsay became part of the trial record without an objection or motion to strike on the part of defense counsel. There is little doubt that such testimony severely damaged defendant's chances for an acquittal. Even minimally competent counsel would have objected to hearsay, rambling opinions, and what the agents thought was going on in the mind of the defendant. Although the State and appellate court agree that defense counsel's performance was hardly commendable, they maintain that it does not equal the sham or farce standard for retained counsel in Illinois. Defense counsel gave a creditable closing statement and did enter three objections during the course of the trial. However, an individual's guilt or innocence should not be effectively determined at the moment he or she unwittingly chooses an incompetent attorney. The late Justice Dooley noted the crucial role effective representation plays in our judicial system: "The fearless and courageous advocate is as important to the administration of justice as an independent judiciary. Without him all rights are mere abstractions. The outcome of the trial of Socrates, Joan of Arc, and Mary Queen of Scots could possibly have been different had a strong and fearless advocate appeared in their defense." (*In re Madsen* (1977), 68 Ill. 2d 472, 494 (Dooley and Clark, JJ., dissenting).) Although defense counsel's performance may not have been a sham or farce, it did fall below the *Greer* standard, which now applies to cases involving both appointed and retained counsel.

In reaching this conclusion, we give great weight to the trial judge's statement that he would definitely have granted a new trial if he did not have to apply the farce-or-sham test. The trial judge was able to observe the demeanor of the witnesses and the effect defense counsel's blunders had on the jury. In view of our disposition of these issues, we need not reach the other issues raised in this appeal.

We therefore conclude that defendant was denied effective assistance of counsel and that the errors of the defense counsel cannot be considered harmless beyond a reasonable doubt. We reverse the judgment of the appellate court and remand the cause to the circuit court of Williamson County for a new trial.

*Reversed and remanded.*