THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ELIZA-BETH EHLERT, Defendant-Appellant.

First District (5th Division) No. 1—93—1518

Opinion filed August 25, 1995.

Rita A. Fry, Public Defender, of Chicago (Allison Edwards, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William Carroll and Celeste Stewart Stack, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNULTY delivered the opinion of the court:

A jury found defendant, Elizabeth Ehlert, guilty of murder but not eligible for the death penalty. The trial court sentenced defendant to 58 years in the Illinois Department of Corrections. Defendant appeals from the conviction and the sentence. We reverse and remand for a new trial.

On August 21, 1990, defendant gave birth in her bedroom, in the home she shared with her two sons, her father, and her fiance, Steven King. Two days later employees of the Salt Creek Park District discovered the body of a newborn in a lake in a golf course. Police dubbed the corpse Baby Jane Doe. A creek which ran behind defendant's house fed into the lake. The medical examiner could not determine the cause of death because she could not tell whether Doe was born alive.

Following a tip from defendant's hairdresser, Joanne Ripp, police contacted King on September 6, 1990. King told the police he thought he heard a baby cry in defendant's bedroom for one or two seconds on August 21, 1990, while defendant was giving birth. Using this evidence in conjunction with her autopsy, the medical examiner determined that Doe drowned.

Police talked with defendant on numerous occasions over the next few weeks. Defendant made contradictory statements concerning the birth. Cellmark Diagnostics compared DNA from Doe's tissue with DNA from defendant's blood and found the DNA matched well enough for them to determine that defendant could have been Doe's mother. The grand jury returned an indictment which charged that defendant drowned Doe either with intent to kill or with knowledge that her acts created a strong probability of death.

Defendant moved to bar evidence that she had had two abortions in the 1980's. Despite defendant's admissions that she had borne two children and that she had medical care throughout those pregnancies, the court found the abortions relevant to determining whether defendant knew she was pregnant. Defendant asked the court to *voir*

*dire* members of the venire concerning their attitudes regarding abortion.

The court read to the venire the document charging defendant with drowning her newborn. The court decided to ask each member of the venire whether she or he had "strong feelings *** relative to the issue of abortion," without asking what those feelings were. If the venire member admitted to having strong feelings the court asked whether the feelings would affect his or her ability to render a fair and impartial verdict in the case. The court denied defendant's request for questions which would give the venire member a context in which to decide whether his or her views on abortion would affect impartiality. In particular, the court refused to ask whether evidence that the defendant had prior abortions would affect the venire member's fairness.

Most members of the venire said they had no strong feelings on abortion. One member of the venire who had strong feelings about abortion said those feelings would not affect her fairness because the case did not deal with abortion; another said, "I know this is somewhat related, but it's not really an abortion, if I understand that it was a newborn child." The court denied defendant's repeated request for clarification to give the venire some context in which to determine whether evidence of prior abortions would affect impartiality.

Three venire members who admitted they had strong feelings about abortion became jurors, and three other jurors said they had opinions on the issue, but all said their opinions and feelings would not affect their ability to decide the case against defendant impartially.

Ripp testified that in April 1990 defendant said she had a cyst in her abdomen. In May, when Ripp noticed that defendant looked pregnant, defendant said she had a cancerous tumor, and she had been unable to get to the hospital to have it removed. King's parents also testified that defendant looked pregnant during the summer of 1990, but she said she had tumors.

Defense witnesses testified that in 1988, two years before this birth, defendant told them she had cancer. A doctor testified that he treated defendant for an ovarian cyst in 1985. The prosecution presented another doctor who testified that defendant had had two abortions.

King testified that in April 1990 defendant told him she had a cyst, and she had seen Dr. Haim Elrad about it. On July 18 she told King that Elrad found ovarian cancer. King told defendant to contact Dr. Philip Gardner or Dr. Josh Tunca. In early August defendant told King that Dr. Tunca told her she did not have cancer, but he wanted to remove the tumor.

A few days later she told King that in preadmission testing Dr. Tunca discovered that defendant was pregnant and the fetus, which was six to eight weeks old, had died. Defendant said Dr. Tunca gave her a shot to induce labor.

Dr. Tunca testified that he never spoke to or examined defendant, and he never had a patient named Elizabeth Ehlert. Dr. Elrad testified that he had not seen or treated defendant since 1988.

King testified that around 3 a.m. on August 21, 1990, defendant woke King up and told him she was in labor. She screamed in pain. King began pacing the hallway. About 30 minutes later, while defendant was still screaming, King said he would call for an ambulance. Defendant told him not to call because the labor was almost over. A few minutes later defendant asked King to get a plastic bag. As he went to get the bag he heard a baby cry for one or two seconds. He asked defendant what that was and she said he might have imagined it, or maybe he heard the dog. He went to the bedroom door to give defendant the bag. Defendant then crossed the hallway to the bathroom, carrying nothing. After five minutes defendant returned to the bedroom. She came out carrying the plastic bag by the top. King did not testify to hearing anything from the bedroom during the five minutes the newborn was alone in there, or to seeing the bag move. Defendant took the bag out back of the house. When she returned she said she put the bag in the creek to let the fetus go back to nature. A few minutes later she delivered the afterbirth on towels on the bed. King threw the towels in the trash. Defendant made a telephone call, telling King she was calling Dr. Tunca. After she finished she said the doctor told her to set up an appointment to see him the next day.

Dr. Richard Levy testified that he examined defendant on August 22, 1990. Defendant told him she had miscarried and flushed the miscarriage down the toilet. Dr. Levy found that defendant had a perineal tear, which was the kind of tear he often found following births of full-term babies. He determined that defendant's uterus was enlarged to approximately the size of a uterus 15 weeks into pregnancy. Immediately after delivery the uterus returns to the size it had at 15 to 20 weeks into the pregnancy, and it generally contracts to near its normal size over the next few days. Dr. Levy concluded that his findings from defendant's examination were consistent with findings he would expect from examining someone who had recently given birth to a full-term baby.

Police officers who questioned defendant on September 6, 1990, testified that she told them she had miscarried a fetus 15 weeks old and flushed it down her toilet. Police told her they had talked to

King. She said she threw the miscarriage in the garbage, then she said King threw it in the garbage. When they said King told them a different story, she said she did not remember what happened, but King's account was probably true because "he doesn't lie." She admitted that she lied to King, and she had not seen any doctors throughout her pregnancy.

Defendant told police her water broke two days before the birth, when she fell while trying to retrieve her son's toy from a tree in her yard. She described the miscarriage as clots of blood, and she said she was "guilty of dumping or whatever." She first indicated that the fetus was about the size she could encircle between her thumbs and forefingers. She next said it was about the size of her purse, which was about 8 inches by 10 inches. When she said she had placed it on a bath towel, police brought a towel and asked her to fold it to the size of her fetus. She folded it to a length of 13$^1$/$_2$ inches, which was approximately Doe's length in the fetal position.

Defendant said she put the garbage bag holding the fetus by a tree near the bank of the creek out back, and it might have slipped into the water. When they asked if she threw it into the creek, she said, "No, unless you want me to say I did it, then I did it." She asked to have Doe buried next to defendant's mother.

A few days later defendant called the police and said she could not live with herself, and she wanted to tell them the truth. She asked them to assure her King would take care of her children if she went to jail. She told them that when she went to the bathroom after delivering the dead fetus, King went to the bedroom, picked up the bloody towels and the baby and threw them out.

Dr. Mitra Kalelkar, assistant medical examiner for Cook County, testified that a number of photographs accurately depicted Doe's condition when Dr. Kalelkar examined her. Dr. Kalelkar determined that bitemarks shown in the photographs were all postmortem injuries, which may have been caused by small animals or fish. She saw "a little bit of hemorrhage on the stump" of the umbilical cord, which indicated that the cord tore before Doe died. She also found hemorrhage underneath Doe's scalp, which showed Doe was alive during the vaginal delivery. Dr. Kalelkar found no external injuries which could have caused the death, and she found all the organs normal. The lungs were aerated and expanded. Doe had no blood and may have "leaked a lot of blood out of the umbilical cord" before dying. She concluded that Doe drowned because her body was found in water and she saw no indication of any other cause of death.

On cross-examination Dr. Kalelkar admitted that after she completed the autopsy she told police officers that she could not

determine whether Doe had been born alive. While her study showed air and a pinkish color to the lungs, she admitted that to some extent that could result from gases formed in decomposition, and her studies did not in themselves establish live birth. She admitted that on August 24, 1990, she wrote in the blank for cause of Doe's death: "pending police investigation," and after police told her about statements obtained from King and defendant, she wrote "drowning" in that blank. She admitted that at a prior hearing she said, "police officers told me she threw the baby *** into the creek, and that's why I'm saying the baby drowned."

Dr. Kalelkar admitted that a newborn can die from inhaling its own amniotic fluid if it is not cleaned after birth, "but it is a remote possibility." Similarly she testified on cross-examination that if the umbilical cord is not tied when it is severed, the baby can bleed to death within several minutes. On redirect she testified that she

> "rul[ed] out an accidental death, obviously this is not a suicidal death, obviously it is not a natural death. That's why I am calling it homicide. That means somebody deliberately did something to this baby, drowned it deliberately."

Defense expert forensic pathologist Dr. John Pless testified in support of defendant's theory that the prosecution could not prove defendant drowned Doe because Doe may have been dead before her corpse entered the water. Dr. Pless found that the physical findings from the autopsy itself could not support a determination as to whether Doe was born alive. He said that a child is born alive if there is evidence of biological activity, such as respiration, circulation, or muscular movement, after complete separation from the mother. A mother experiences a birth and the fetus is born, even if it died in the uterus or in the birthing process.

The color and size of Doe's lungs, and the air found in the lungs, could have been caused by decomposition rather than breathing. The hemorrhage shown on the skull did not prove a live birth. Even if Doe were stillborn, she could have shown the reddened area of the umbilical cord found here. Dr. Pless also found squame cells in Doe's lungs. He said a baby can breathe in amniotic fluid, which contains squame cells, with its first breath, and that can kill the baby. He admitted that with modern medicine the result is rare, but the probability is much higher in a home delivery without medical attention. From all the evidence, he could not determine whether Doe died on her own before she entered the water.

Dr. Pless agreed that trauma caused by the mother's fall from a tree could cause the placenta to detach from the uterine wall, and the detachment could cause fetal death. Although he believed the ev-

idence did not lead to the conclusion that disease, genetic deformity or any other such natural force could have caused the death, he could not altogether exclude the possibility of infection. He saw no evidence to distinguish accidental death from homicidal death here, even from all of the prosecution's case.

In rebuttal Dr. Kalelkar testified that she did not believe the decomposition was so advanced that she would not have found evidence of infection if Doe had died from an infection. She found neither enough squames in the airway, nor other evidence of fetal distress, to support the suggestion that Doe died from inhaling her amniotic fluid.

Defendant requested an instruction directing the jurors that to find murder they must find beyond a reasonable doubt that Doe was born alive. The court denied the request, saying that the instruction required a theological determination of when life begins. The court also denied defendant's motion *in limine* to preclude the prosecution from arguing that defendant may have killed Doe by some means other than drowning.

The prosecutor argued to the jury that the evidence showed drowning, and then argued that if defendant

"had that baby at home, pulled out the cord, didn't clamp it, didn't call for help, just stuck it in the bag, she killed it just as sure as if it drowned.

\* \* \*

What if \*\*\* she just placed it by the creek and some animal pulled it in[?] A raccoon pulled it in. Does that mean that the raccoon is guilty of murder, and she is not?

\* \* \*

When she puts that baby in harms way, she causes that death." The prosecutor added that nothing "says we have to prove drowning."

The court instructed the jurors to find defendant guilty of murder if they found that she

"performed the acts which caused the death of the newborn baby, Jane Doe, and \*\*\* that when the Defendant did so, she intended to kill or do great bodily harm to the newborn baby, Jane Doe."

Around 4 p.m. on the third day of deliberations, the jurors sent the judge a note saying they could not reach a unanimous decision. A few minutes later they asked for more time. At 8:20 p.m. that day the jury returned the verdict finding defendant guilty of murder.

Following further evidence and arguments, the jurors found that they could not agree on the proposition that defendant committed the murder in a "cold, calculated and premeditated manner pursuant

to a preconceived plan, scheme or design to take a human life." Therefore the jury found that defendant was not eligible for the death penalty.

■ Defendant argues that the trial court erred by allowing evidence that she had two prior abortions. Both the court and the prosecutor have "a duty to avoid the introduction of evidence, the prejudicial effect of which outweighs its relevance." (*People v. Jones* (1982), 94 Ill. 2d 275, 286, 447 N.E.2d 161.) This court will not reverse a decision regarding the admissibility of evidence unless the trial court abused its discretion to the prejudice of the defendant. (*People v. Daniels* (1987), 164 Ill. App. 3d 1055, 1078, 518 N.E.2d 669.) The trial court must not admit evidence "which only serves to cause the jury to believe a defendant to be a bad, cruel or evil person, and hence likely to be guilty of the crime charged." (*People v. Liapis* (1972), 3 Ill. App. 3d 864, 868, 279 N.E.2d 368.)

> "A defendant's guilt must be established by legal and competent evidence, uninfluenced by bias raised by irrelevant evidence which serves only to prejudice him in the eyes of the jury." *People v. Hines* (1967), 87 Ill. App. 2d 283, 288, 232 N.E.2d 111.

Applying these standards, appellate courts have reversed convictions where the prosecution has presented evidence that the defendant engaged in immoral sexual conduct (*People v. Scaggs* (1982), 111 Ill. App. 3d 633, 636, 444 N.E.2d 674; *People v. Petitt* (1993), 245 Ill. App. 3d 132, 140-41, 613 N.E.2d 1358) or homosexual acts (*People v. Reimnitz* (1979), 72 Ill. App. 3d 761, 763, 391 N.E.2d 380), even where the evidence had some relevance to the prosecution's theory (*People v. Johnson* (1991), 215 Ill. App. 3d 713, 733, 575 N.E.2d 1247). We find that evidence of prior abortions has similar prejudicial effect. As our supreme court has said, "Abortion with all its involvements is a particularly fertile field for preconceived notions and prejudices." *People v. Murawski* (1954), 2 Ill. 2d 143, 147, 117 N.E.2d 88.

The State's evidence that defendant gave birth to two children and that she had prenatal medical care during both of those pregnancies sufficiently showed that she probably knew how pregnancy felt. The jury could infer that she could distinguish a live baby from a growing tumor. The evidence of two abortions had negligible probative value for bolstering this inference. The prejudicial effect of the evidence far outweighed its probative value. The trial court abused its discretion by admitting evidence of the two abortions.

The State argues that the trial court eliminated the prejudicial effect of this inflammatory evidence by asking members of the venire whether their views on abortion would affect their fairness. When the court asked this question the jurors knew that defendant had

been charged with murdering her newborn infant. The court repeatedly refused to inform the venire that there might be evidence of prior abortions. Both of the venire members who explained why their views on abortion would not affect fairness said that murdering a newborn, while similar to abortion, was clearly distinct from abortion in their minds.

■ In the context of the questions asked of the venire, the court can infer from the jurors' answers only that they could distinguish murdering a newborn from abortion. The court cannot infer that evidence of defendant's prior abortions would not affect their impartiality. The jurors never said they would not be so affected because the trial court never asked that question. See *Murawski*, 2 Ill. 2d at 147 (trial court should have asked venire members, "Are you of the opinion that an abortion should never be performed?").

We do not find that the court should have further questioned jurors regarding their views on abortion. We hold that the evidence of prior abortions, or any evidence of prior pregnancies which did not result in live births, was inadmissible. In light of the evidence of two live births and defendant's course of medical care for those pregnancies, the evidence regarding pregnancies which ended in abortion served only to prejudice defendant, especially in the minds of the three jurors who admitted they had "strong feelings" about abortion.

■ The State next contends that the erroneous admission of evidence of prior abortions was harmless. We disagree. The evidence in this case was closely balanced. The jurors deliberated for three days, and sent a note telling the court they could not agree, before they reached the verdict. "[T]he length of the jury deliberations and the jury's note demonstrate the closely balanced nature of the evidence ***." (*People v. Palmer* (1984), 125 Ill. App. 3d 703, 712, 466 N.E.2d 640.) Prosecutors virtually conceded in closing argument their inability to prove beyond a reasonable doubt the actual charge, that defendant drowned the baby, as the prosecutor suggested that the evidence could support findings that the baby died in one of several other ways, and argued that defendant would still be guilty of murder.

The prosecutor needed such argument because of the considerable evidence that the baby died before her body reached the water. Dr. Kalelkar admitted that all of the bitemarks on the body were from postmortem injury, indicating that animals in or near the water did not reach the body until sometime following death. While King testified that he heard a cry for one or two seconds, he also said that defendant left the bedroom shortly thereafter, carrying nothing, as she crossed the hall to the bathroom where she stayed for five

minutes. King did not report hearing a sound from the bedroom in that time. King also did not report hearing any sounds or seeing any movements indicative of life coming from the plastic bag defendant later carried out of her bedroom. This evidence supports an inference that the baby was already dead and therefore must not have drowned. Since neither pathologist found evidence of trauma or injury after birth, the trier of fact could infer that the baby may have died in the process of birthing.

Dr. Kalelkar, the only witness who said the baby was born alive, admitted that when she completed her initial autopsy she could not determine whether the baby was born alive. She found sufficient evidence to declare a live birth only after she heard that King told police that he thought he heard a baby cry. Dr. Pless reviewed the physical evidence Dr. Kalelkar saw and found it insufficient to establish a live birth. He added that even if King correctly remembered hearing a cry for one or two seconds, the baby could have died in the birthing process. The presence of squames in the baby's airway corroborated this theory to some extent, but he said most of the evidence may have washed away while the baby's corpse was in the water. Dr. Kalelkar disagreed, as she believed more squames or other evidence of distress would have remained.

The evidence of live birth, while sufficient for presentation to a jury, is closely balanced. In the absence of live birth, defendant cannot be guilty of murder. (*People v. Greer* (1980), 79 Ill. 2d 103, 116, 402 N.E.2d 203.) Evidence of defendant's prior abortions, which some jurors may have regarded as the moral equivalent of murders, could have predisposed the jurors to find defendant guilty. As our supreme court held in *People v. Cruz* (1994), 162 Ill. 2d 314, 374, 643 N.E.2d 636:

> "Because the evidence of defendant's guilt is not overwhelming, errors which occurred have greater significance than would otherwise have been the case. And because we cannot say beyond a reasonable doubt that these errors did not affect the verdict [citation], reversal is required."

We address only those further issues which are likely to arise on remand. Defendant argues that the instructions improperly permitted the jury to conclude that defendant could be guilty of murder if her failure to seek prenatal care and medical assistance contributed to causing her baby to fail to survive the birth process. Prosecutors never argued this theory, and they contend that no juror could reasonably interpret the instructions to permit a finding of guilt on this theory. We disagree. The instructions required the jury to return a guilty verdict on a finding that any of defendant's acts

contributed to causing the death, as long as defendant intended to kill Doe at the time of the act. The State presented substantial evidence that throughout her pregnancy defendant lied about her condition, and the jury could infer that throughout that time she intended not to allow her baby to live. Defendant's expert witnesses agreed that the failure to seek prenatal care and medical care during delivery increased the likelihood of death either before, during, or immediately after birth. Thus, the jury could infer that defendant's failures contributed to causing the death, and she failed to get care at a time when she intended to kill her fetus. Under the instructions the jury could find murder based on defendant's failure to seek prenatal care.

The State contends that the instructions required the jury to find that Doe was born alive because the instructions specified that the jury needed to find defendant intended to harm "the newborn baby, Jane Doe." As Dr. Pless explained, the baby is born even if it is stillborn or if it does not survive the birth process. No instruction precluded the jurors from inferring that Doe would count as a newborn as long as she was born, even if she died shortly before birth or in the process of being born.

The court rejected defendant's proposed instruction on live birth not because other instructions already required the finding, but because the proposed instruction made a theological statement concerning when life begins. In the eyes of the law a fetus cannot be a victim of murder unless the fetus is born alive. (*Greer*, 79 Ill. 2d at 116.) By failing to instruct the jurors on the legal requirement, the court permitted the jurors to engage in theological speculation concerning whether the fetus counted as alive prior to birth, allowing them to convict defendant of murder even if the fetus was stillborn or did not survive birthing.

Defendant offered an instruction not in the Illinois Pattern Jury Instructions, Criminal (3d ed. 1992) (IPI) to clarify the need for proof of a live birth. "Approved pattern instructions are to be used generally, and may be modified or supplemented only when the facts of the particular case make them inadequate." (*People v. Mitchell* (1984), 129 Ill. App. 3d 189, 199, 472 N.E.2d 114.) "A non-IPI instruction should be given if a pattern instruction does not contain an accurate instruction on the subject the jury should be instructed upon ***." (*People v. Sequoia Books, Inc.* (1987), 160 Ill. App. 3d 750, 759, 513 N.E.2d 1154.) The court must give a non-IPI instruction "if the refusal to give a non-IPI instruction results in the jury not being instructed as to a defense theory of the case which is supported by some evidence." *People v. Hanson* (1985), 138 Ill. App. 3d 530, 540, 485 N.E.2d 1144.

Here defendant presented expert testimony that defendant's baby may have died either shortly before birth or in the birth process. Although death prior to a complete live birth legally precludes a finding of murder, the trial court failed to instruct the jury on the theory. On remand the trial court should instruct the jurors that to find defendant guilty of murdering Doe, they must find beyond a reasonable doubt that Doe was born alive.

Since the State does not seek to hold defendant criminally liable for any acts before birth, we need not address the thorny constitutional and policy difficulties such criminalization would entail. (See Note, *Maternal Rights and Fetal Wrongs: The Case Against the Criminalization of "Fetal Abuse,"* 101 Harv. L. Rev. 994 (1988).) The court's instructions should confine the jurors' attention to the theories the State claims to prove. To do so the court need only amend the IPI issues instructions thus:

> "To sustain the charge of first degree murder, the State must prove the following propositions:
>
> First: That the baby, Jane Doe, was born alive; and
>
> Second: That after the live birth the defendant performed the acts which caused the death of the baby, Jane Doe; and
>
> Third: That when the defendant did so, she intended to kill or do great bodily harm to the baby, Jane Doe; or
>
> She knew that her acts created a strong probability of death or great bodily harm to the baby, Jane Doe."

(See IPI Criminal 3d No. 7.02.) The court should also give again on retrial the pattern instruction defining cause which it gave at trial. IPI Criminal 3d No. 7.15.

Due to the improper admission into evidence of testimony concerning defendant's prior abortions, the cause must be remanded for retrial in accord with the principles stated herein.

Reversed and remanded, with directions.

COUSINS, P.J., and GORDON, J., concur.