# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Wilmington*, 2011 IL App (1st) 072518-B

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LAMAR WILMINGTON, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1–07–2518 |
| Filed | June 16, 2011 |
| Rehearing denied | August 1, 2011 |
| Modified opinion filed | August 4, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions and sentences for first degree murder and concealment of a homicidal death were upheld even though the trial court failed to fully comply with Supreme Court Rule 431(b), since the evidence against defendant was overwhelming, and, furthermore, the trial court's error in not questioning defense counsel in defendant's presence about the tender of a lesser mitigated offense instruction and not asking defendant if he agreed with the tender did not affect the fairness of the trial or challenge the integrity of the judicial process. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 04–CR–17014; the Hon. Thomas V. Gainer, Jr., Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal        Michael J. Pelletier, Alan D. Goldberg, and Brian E. Koch, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Ashley A. Romito, and Jessica R. Ball, Assistant State's Attorneys, of counsel), for the People.

Panel        JUSTICE STERBA[*] delivered the judgment of the court, with opinion. Justices Neville and Pucinski[**] concurred in the judgment and opinion.

**OPINION**

¶ 1      Following a jury trial, defendant Lamar Wilmington was convicted of the first degree murder of Guan McWilliams and of concealing that homicidal death. Wilmington was sentenced to consecutive terms of 50 years and 5 years in prison, respectively, for those crimes. On appeal, Wilmington contends that he was denied a fair trial for two reasons: (1) the circuit court did not ascertain that Wilmington consented to his counsel's tendering of a jury instruction on second degree murder; and (2) the circuit court did not fully comply with the *voir dire* requirements of Illinois Supreme Court Rule 431(b) (Ill. S. Ct. R. 431(b) (eff. May 1, 2007)). Because the circuit court's admonitions to potential jurors did not comply with Rule 431(b), this court reversed Wilmington's convictions and sentences and remanded for a new trial in an opinion filed September 24, 2009 (*People v. Wilmington*, 394 Ill. App. 3d 567 (2009)). On January 26, 2011, the Illinois Supreme Court issued a supervisory order directing this court to vacate its judgment and reconsider in light of *People v. Thompson*, 238 Ill. 2d 598 (2010). *People v. Wilmington*, 239 Ill. 2d 588 (2011) (table). For the reasons that follow, we affirm Wilmington's convictions and sentences.

---

[*]Pursuant to Justice Gallagher's retirement, Justice Sterba delivered the judgment of the court, with opinion, in the reconsideration of this case. Justice Sterba has reviewed all relevant materials, including the original opinion filed on September 24, 2009, and the supervisory order issued by our supreme court on January 26, 2011.

[**]Pursuant to Justice O'Mara Frossard's retirement, Justice Pucinski has participated in the reconsideration of this case. Justice Pucinski has reviewed all relevant materials, including the original opinion filed on September 24, 2009, and the supervisory order issued by our supreme court on January 26, 2011.

¶ 2                                    BACKGROUND

¶ 3        On March 4, 2004, McWilliams' body was found in a garbage can at 7446 South Eberhart in Chicago. An autopsy revealed that McWilliams had been shot twice in the top of the head. About a week later, Wilmington went to the Third District police station and stated that he had information about a person who was killed in the vicinity of 74th Street and Eberhart. He told a detective that he was at a party and overheard a person known as "Dollar" say that he killed a man who was gay and threw him in the garbage. Police interviewed Dollar and eliminated him as a suspect.

¶ 4        On June 14, 2004, Wilmington returned to the police station and reported that his head had been grazed by a bullet. After investigating that complaint, Detective Gerald Hamilton advised Wilmington of his *Miranda* rights. He subsequently informed Wilmington that he had questioned Dollar and had eliminated him as a suspect in McWilliams' death. Hamilton testified that upon hearing this information, Wilmington appeared visibly shaken and told him that he had lied about Dollar. He then made some additional statements to the police and subsequently consented to a search of his apartment. Wilmington accompanied the officers to his residence at 7318 South Eberhart and showed them the basement room where he told them McWilliams had been shot. Wilmington informed the officers that the condition of the room had changed since the night of the murder. Drywall had been put in, a rug was put down on the concrete floor, and some additional furniture had been placed inside.

¶ 5        Assistant State's Attorney George Canellis testified that he went to the police station on June 16, 2004, and interviewed Wilmington. Canellis advised Wilmington of his *Miranda* rights and Wilmington indicated that he understood and stated that he wished to speak with Canellis. When asked how he wished to memorialize his statement, Wilmington indicated that he wanted it to be handwritten. He said that he did not want the statement to be videotaped because he did not want anyone to see him talking about having "gay sex." Wilmington told Canellis that he and McWilliams met at a bar in 2003 and had sex later that same night. After their initial encounter, they occasionally had sex when McWilliams would call and initiate a meeting. Wilmington said that he was a member of the Black Disciples street gang and that nobody knew about his sexual orientation, including his family, friends, people in the neighborhood, and fellow gang members. Wilmington told Canellis that the Black Disciples did not like people who were gay or who had "gay sex."

¶ 6        Wilmington said that on March 3, 2004, McWilliams called him and asked for $200. Wilmington said he had no money, but told McWilliams to come to his residence anyway. Wilmington rented a basement room and other people lived in the residence, but nobody else was home at that time. After they had sex, McWilliams again asked for money and they began to argue. McWilliams said he had AIDS and threatened to tell police Wilmington had raped him. McWilliams pulled out a gun, but Wilmington was able to take it away from him because Wilmington was bigger and stronger. They continued to argue, and Wilmington became angry and called McWilliams a "little bitch." McWilliams threatened to tell people in the neighborhood that they were having sex. Wilmington told Canellis he did not want anyone to know that he had sex with McWilliams because that was his personal business and if people in the neighborhood knew, they would make fun of him and give him a hard time.

¶ 7     While Wilmington held the gun, McWilliams, who Wilmington said was naked and unarmed, ran at him. Wilmington said he fired about four shots, striking McWilliams in the top of the head because McWilliams was hunched over when he ran at Wilmington. McWilliams fell to the floor, bleeding, and Wilmington said he looked like he was dead. Wilmington said that he put underwear and a shirt on McWilliams, dragged the body outside, and left it on a sidewalk in the back of the residence while he went to get help from a fellow gang member named Ramsey. Wilmington told Ramsey that a drug deal had gone bad and he killed McWilliams by mistake. He said that Ramsey came back to the house with him and told him to put the body in a garbage can. Wilmington got a neighbor's garbage can, picked up McWilliams' body and threw it into the can, and then he and Ramsey wheeled the can about a block away and left it there. Wilmington used bleach to clean the floor, threw out the shell casings and the rest of McWilliams' clothes, and gave the gun to another fellow gang member.

¶ 8     Wilmington told Canellis that he had originally implicated Dollar because he and Dollar had fought over a girl. He told Canellis that when he went to the police station to report the incident where a bullet grazed his head, he also talked to the police about McWilliams' murder. Wilmington said that, because he was scared, he told police at that time that Ramsey had killed McWilliams. He then said that the reason he told Canellis the truth in his statement was because he wanted to clear his conscience. Upon completion of the statement, Canellis told Wilmington he was going to review it with him. However, after they got through the *Miranda* warnings on the first page, Wilmington said that he had changed his mind and refused to sign the statement. He did agree to sign a Polaroid photograph of himself taken by Canellis at the time of the interview.

¶ 9     Both sides stipulated that a red substance that was collected on cotton swabs from the wall and the floor of Wilmington's bedroom was not blood and that samples collected from McWilliams' fingernails only matched McWilliams' DNA profile. The forensic investigator testified that he did not find any bullet holes in the walls in Wilmington's bedroom or in the area just outside his room. Testimony established that articles of clothing that were found on the body included a tee-shirt, boxer shorts, a shirt, a sweatshirt, jeans, socks, and a nylon cap known as a "do-rag."

¶ 10    The parties stipulated that, according to the records of the department of streets and sanitation, the garbage can in which McWilliams' body was found was assigned to 7319 South Vernon. Officer Carol Parker testified that she went to that address and discovered that it was a vacant building without any garbage cans. She confirmed that 7318 South Eberhart and 7319 South Vernon share the same alley. A fingerprint examiner with the Illinois State Police crime lab testified that the garbage can did not contain any suitable latent fingerprint impressions.

¶ 11    Dr. Nancy Jones, the medical examiner, testified that the first bullet entered the top of the head and followed a downward path through the skull and into the brain, moving from the back of the body toward the front and lodging in the center of the head. The second bullet also entered the top of the head, went through the scalp and skull, and then went straight down into the head. Dr. Jones found no evidence of close-range shooting, which would generally be found where the weapon was between 18 to 24 inches from the body at the time

it was fired. She did not take any rectal or mouth swabs and did not see any apparent semen. Dr. Jones testified that she also found blunt trauma injuries consisting of large abrasions or scratches and some bruising on the back that occurred around the time of death. She stated that some of the abrasions were consistent with McWilliams' body being dragged on the sidewalk after he had been shot, and the bruises were consistent with his body being dropped on the sidewalk after the shooting. Dr. Jones testified that McWilliams' blood alcohol level was twice the legal limit and there was also a small amount of cocaine, which would mean it had been ingested relatively close to the time of death or it would have metabolized into benzoylecgonine.

¶ 12    For the defense, Dr. Robert Hanlon, a clinical neuropsychologist, testified that Wilmington had mild mental retardation with an IQ of 67 and read at a first-grade level. Wilmington also had a chronic seizure disorder that was documented back to 1998. Dr. Hanlon testified that being involved in an argument over a weapon, shooting someone, and moving and secreting a body would have been a stressful situation and it was unlikely that Wilmington could have committed such a crime without suffering a seizure, although the State's version of events was "certainly possible."

¶ 13    In rebuttal, the State called Alesia Hines, a paramedic with Cermak Health Services. Hines testified that she questioned Wilmington about the date of his last seizure, and he told her that his last seizure had been in 1995. The State also called Dr. Dawna Gutzmann, a staff psychiatrist with Forensic Clinical Services, who interviewed Wilmington several times. Wilmington told her that he had a seizure in 2002 and then starting having seizures frequently in the year leading up to his arrest. Dr. Gutzmann noted that there was some evidence of malingering, *i.e.*, when a person fakes or exaggerates a symptom of a psychological or medical illness for secondary gain. Wilmington reported to another doctor that he was having seizures in the courtroom and that he would sometimes have none for a month, but then would have three or four in a day. Dr. Gutzmann stated that in her opinion, Wilmington had no mental or physical disorder that would affect his ability to commit the alleged offense.

¶ 14    At defense counsel's request, the circuit court instructed the jury on second degree murder. During the deliberation process, the jury sent three notes, collectively containing two questions and three requests for exhibits, out to the judge. The jury asked for the transcript of Canellis' testimony, the felony review folder exhibit, and the statement Canellis took from Wilmington. The jury also asked whether there was a summary sheet for all of the exhibits, and whether it was allowed to see defense exhibits or just the State's exhibits. The final note was sent out approximately 2 hours and 40 minutes after the start of deliberations. The jury returned a verdict of guilty of first degree murder and of the concealment of a homicidal death. The circuit court sentenced Wilmington to consecutive sentences of 50 years and 5 years in prison, respectively, for those crimes. Wilmington timely filed this appeal.

¶ 15    On September 24, 2009, this court reversed Wilmington's convictions and sentences and remanded for a new trial (*People v. Wilmington*, 394 Ill. App. 3d 567 (2009)). On January 26, 2011, the Illinois Supreme Court issued a supervisory order directing this court to vacate its judgment and reconsider in light of *People v. Thompson*, 238 Ill. 2d 598 (2010), to determine whether a different result is warranted. *People v. Wilmington*, 239 Ill. 2d 588

(2011) (table). On March 10, 2011, this court granted Wilmington leave to file a supplemental brief and permitted the State to file a response.

¶ 16                                     ANALYSIS

¶ 17     We first address Wilmington's contention that this court must reverse his conviction and remand for a new trial because the circuit court's admonitions to the jury venire did not comply with Rule 431(b). That rule codifies the Illinois Supreme Court's holding in *People v. Zehr* that four inquiries must be made of potential jurors in a criminal case that " 'go[ ] to the heart of a particular bias or prejudice which would deprive [a] defendant of his right to a fair and impartial jury.' " *People v. Zehr*, 103 Ill. 2d 472, 477 (1984) (quoting *People v. Zehr*, 110 Ill. App. 3d 458, 461 (1982)). Our review of the interpretation of a supreme court rule is *de novo*. *People v. Suarez*, 224 Ill. 2d 37, 41-42 (2007).

¶ 18     The version of Rule 431(b) that was in effect when Wilmington's trial occurred in July 2007 provided:

"(b) The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431(b) (eff. May 1, 2007).

¶ 19     Here, before *voir dire* was conducted of individual panel members, the circuit court admonished the entire group of potential jurors about each of the four principles in *Zehr*:

"Mr. Wilmington[,] as with other persons charged with crimes[,] is presumed to be innocent of the charges that bring him before you. *** It is absolutely essential as we select this jury that each of you understand and embrace these fundamental principles; that is, that all persons charged with a crime are presumed to be innocent and that it is the burden of the state who has brought the charges to prove the defendant's guilt beyond a reasonable doubt.

What this means is that the defendant has no obligation to testify in his own behalf or to call any witnesses in his defense. He may simply sit here and rely upon what he and his attorneys perceive to be the inability of the state to present sufficient evidence to meet their burden. Should this happen, you will decide this case on the basis of the evidence presented by the prosecution. The fact that *** the defendant chooses not to testify must not be considered by you in any way in arriving at your verdict."

¶ 20     After giving other admonitions, the circuit court returned to the *Zehr* principles. The court asked the venire members if they disagreed with those concepts:

"I spoke to you earlier about some fundamental principles of law. I want to ask you as a group one more time about these fundamental principles. I spoke about the facts–and when I ask these questions–by the way so I don't miss anybody, I'm going to do what I did with the witness questions. I'm going to go to the [jury] box first and then I'm going to do the left side of the courtroom and then the right side of the courtroom.

I have spoke[n] about the fact the defendant is presumed to be innocent of the charges against him and that this presumption stays with the defendant throughout the trial and is not overcome unless and until the jury determines the defendant is guilty beyond a reasonable doubt.

Is there anyone in the courtroom here in the jury box amongst you who disagrees with this fundamental principle of law? If so, please raise your hand."

¶ 21     The circuit court then asked that question to the groups of potential jurors seated on the right and left sides of the courtroom, noting as to each group that "no hands are raised."

¶ 22     The circuit court made two more specific inquiries of the three groups in the venire:

"I also spoke about the fact the State has the burden of proving the defendant guilty beyond a reasonable doubt. Is there anyone among you *** who disagrees with this fundamental principle of law? If so, please raise your hand."

¶ 23     The circuit court continued:

"Because the defendant is presumed to be innocent, he does not have to present any evidence at all in this case. He can simply rely on the presumption of innocence. Is there anyone among you *** who disagrees with this fundamental principle of law? If so, please raise your hand."

¶ 24     After asking each question to each group, the circuit court noted, "The record should reflect no hands are raised."

¶ 25     Wilmington contends that even though the circuit court informed the venire members of all four *Zehr* principles, the admonitions violated Rule 431(b) because the court did not question the potential jurors about their understanding and acceptance of one of the principles, *i.e.*, the defendant's right not to testify. The State argues that Wilmington waived this issue by failing to object at trial or raise it in a posttrial motion. However, if this court decides to review this issue, the State concedes that the court did not ask potential jurors if they understood that Wilmington had the right not to testify, but argues the admonitions substantially complied with Rule 431(b). The State argues that the admonition as to Wilmington's right not to present any evidence effectively encompassed the principle of a defendant's right not to testify. The State also asserts that any omission can be deemed harmless error.

¶ 26     Issues raised on appeal are preserved for review by objecting during trial and filing a written posttrial motion raising the alleged error (*People v. Enoch*, 122 Ill. 2d 176, 186 (1988)), and when a defendant does not object at trial to a subsequently claimed error, a plain error analysis is appropriate. See *People v. Herron*, 215 Ill. 2d 167, 181-82 (2005) (plain error applies when defendant fails to object, while harmless error applies when a timely objection is made). The plain error doctrine allows errors not previously challenged to be

considered on appeal if either: (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant; or (2) the error was so fundamental and of such magnitude that it affected the fairness of the trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007); *Herron*, 215 Ill. 2d at 177. However, before conducting a plain error analysis we must determine whether an error in fact occurred. *People v. Sims*, 192 Ill. 2d 592, 621 (2000).

¶ 27    In our original opinion, we determined that the circuit court complied with Rule 431(b) regarding three of the principles, but erred when it failed to question potential jurors about their understanding and acceptance of the principle that the defendant's decision not to testify cannot be held against him. *Wilmington*, 394 Ill. App. 3d at 574-75. However, Wilmington points out in his supplemental brief that under *Thompson*, the circuit court also erred in questioning the potential jurors about the remaining three principles because it failed to ask whether the venire understood those principles.

¶ 28    In *Thompson*, our supreme court noted that the circuit court did not ask prospective jurors whether they understood and accepted the principle that the defendant is not required to present any evidence on his own behalf. *Thompson*, 238 Ill. 2d at 607. The court stated that this failure, by itself, constituted noncompliance with the rule. *Id*. However, the court went on to say that although the circuit court asked prospective jurors whether they understood the presumption of innocence, it did not ask whether they accepted that principle. Thus, the court concluded, this was an additional violation of the rule. *Id*.

¶ 29    Similar reasoning is applicable here. The circuit court did not ask prospective jurors whether they understood and accepted that the defendant has a right not to testify and that the defendant's failure to testify cannot be held against him, and this failure alone constituted error. Moreover, the circuit court only asked prospective jurors whether they disagreed with the remaining three principles, and did not ask whether they understood these principles, and this also constituted error under *Thompson*. Therefore, we conclude that the circuit court failed to comply with Rule 431(b). Accordingly, we must now determine whether this was reversible error under the plain error doctrine.

¶ 30    On appeal, Wilmington originally argued that his convictions should be reversed under both prongs of the plain error analysis. In our original opinion, we held that the failure to comply with Rule 431(b) denied Wilmington a fair trial, and we therefore reversed under the second prong of the plain error analysis. *Wilmington*, 394 Ill. App. 3d at 575. Accordingly, we did not address Wilmington's argument under the first prong. See *People v. Harvey*, 211 Ill. 2d 368, 389 (2004). In his supplemental brief, Wilmington concedes that he can no longer prevail under the second prong after *Thompson*, but urges this court to reverse under the first prong because the evidence in his case was closely balanced.

¶ 31    In *Thompson*, our supreme court observed that "[w]hile trial before a biased jury is structural error subject to automatic reversal, failure to comply with Rule 431(b) does not necessarily result in a biased jury." *Thompson*, 238 Ill. 2d at 610. Because there was no evidence that the defendant in *Thompson* was tried by a biased jury, the court held that the circuit court's error did not require reversal of the defendant's conviction. *Id*. at 611. Here,

there is likewise no evidence that the jury was biased and Wilmington does not argue that it was. Therefore, we need only address Wilmington's claim under the first prong, *i.e.*, that the evidence was closely balanced.

¶ 32 Wilmington contends that the evidence was closely balanced for several reasons: (1) the jury deliberated for several hours and sent several questions to the judge during its deliberations; (2) there was no physical evidence or eyewitness testimony to implicate Wilmington; (3) Wilmington's statement was unreliable because of his mental retardation and lengthy interrogation, conflicts between his statement and the physical evidence, the uncorroborated nature of many of the assertions in the statement, and the expert testimony of Dr. Hanlon; and (4) Wilmington exercised his right not to testify, the very right the circuit court failed to ask the potential jurors about during *voir dire.*

¶ 33 Wilmington relies on *People v. Ehlert*, 274 Ill. App. 3d 1026 (1995), for the proposition that lengthy deliberations are an indication of closely balanced evidence. We find this reliance to be misplaced. In *Ehlert*, the jurors deliberated for three days and sent out a note stating they could not reach a unanimous decision before finally returning a verdict. *Id.* at 1035. Here, the record does not disclose what time the jury returned the verdict, but deliberations began at 2:12 p.m., the final note was sent out at 4:52 p.m., and the verdict was returned that same day. Moreover, the notes were for the purpose of asking questions or requesting transcripts or exhibits, not for informing the judge that the jurors had reached an impasse. Thus, we conclude that the length of deliberations and the notes sent out by the jury here do not indicate that the evidence was closely balanced.

¶ 34 Dr. Hanlon testified that Wilmington has mild mental retardation and that his seizure disorder would have made it difficult for him to commit the crime as alleged, although not impossible. Testimony at trial established that Wilmington was able to understand the questions and respond appropriately. Dr. Gutzmann testified that Wilmington did not have any mental or physical disorder that would have made it impossible for him to commit the offense. She further testified that Wilmington gave different stories regarding how recently and how frequently his seizures had occurred, and that she suspected he may have been exaggerating the seizure disorder for secondary gain. In any event, Wilmington's own expert acknowledged that it was "certainly possible" that Wilmington committed the offense.

¶ 35 The record discloses that Wilmington voluntarily injected himself into the investigation of McWilliams' death by presenting himself at the police station and informing police that Dollar had killed McWilliams. When he returned to the police station to report a separate alleged crime against himself, Wilmington admitted that he had lied about Dollar and again volunteered information about McWilliams' murder to the police. He provided names of alleged perpetrators and witnesses and an address for the crime scene. He then consented to a search of his residence and accompanied police to the location, where he told them that significant changes had been made to the room since the time of the murder. The length of time that it took for Wilmington to provide a statement was prolonged by the police investigating the crime scene and looking for witnesses, based on information provided by Wilmington and with Wilmington accompanying the police for a significant part of the investigation. Wilmington was not, as he implies, merely left in an interview room for two days and pressured until he finally gave a statement.

-9-

¶ 36 Wilmington refused to sign the statement, but this does not necessarily lead to a conclusion that the statement was not true. In fact, it is equally possible that he refused to sign for the same reason he refused to provide a videotaped statement, namely, that he did not want his sexual orientation known within the community. As for the statement itself, the only significant inconsistency is that Wilmington said he put boxer shorts and a tee-shirt on McWilliams' body and threw the rest of his clothes away; however, the body was found fully clothed and only the shoes were missing. This inconsistency alone does not indicate the evidence was closely balanced. Wilmington also said he "thought" he fired about four shots. Only two bullets were recovered, and no shell casings were found. It is possible that Wilmington did, in fact, fire four shots and two of them missed and the resulting bullet holes were subsequently covered up with drywall or the bullets landed outside the room. However, Wilmington was not sure how many shots he actually fired and it is equally possible that he only fired two shots.

¶ 37 Other details in the statement are consistent with the evidence. Wilmington said he used a neighbor's garbage can, and the can in which McWilliams' body was found was registered to a location across the alley from Wilmington's residence. He also said he and Ramsey wheeled the garbage can about a block away, and the garbage can was in fact found about a block away from Wilmington's residence. The evidence also showed that the abrasions on the back were consistent with Wilmington's account of dragging McWilliams' body to the sidewalk behind his residence.

¶ 38 Finally, the most crucial detail in Wilmington's statement was corroborated by the medical examiner's testimony regarding the highly unusual way in which McWilliams was killed. Wilmington told Canellis that McWilliams was hunched over and running at him when he fired the gun, so the bullets hit McWilliams in the top of the head. The medical examiner testified that the two bullets found in the body entered the top of the head and followed downward paths into the brain. The record is devoid of any evidence that would suggest someone told Wilmington how McWilliams was killed, thus, Wilmington's own account places him at the crime scene. Therefore, we conclude that the evidence was not closely balanced and Wilmington's argument that the first prong of the plain error analysis requires reversal is unavailing.

¶ 39 The second issue raised by Wilmington in this appeal involves jury instructions. Defense counsel submitted jury instructions on first degree and second degree murder. Wilmington contends that the circuit court was required to determine whether he agreed to the issuance of the second degree murder instruction, citing *People v. Medina*, 221 Ill. 2d 394, 409 (2006), in which our supreme court stated that where a lesser included offense instruction is tendered, the circuit court should ask defense counsel, in defendant's presence, whether counsel has informed defendant of the potential penalties associated with the lesser offense and that the court also must ask defendant whether he agrees with the tender.

¶ 40 Because Wilmington did not preserve this issue for review, a plain error analysis is appropriate. See *Herron*, 215 Ill. 2d at 181-82. Thus, we may consider this issue if either: (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant; or (2) the error was so fundamental and of such magnitude that it affected the fairness of the trial and challenged the integrity of the judicial process, regardless

of the closeness of the evidence. *Piatkowski*, 225 Ill. 2d at 565. As noted above, the evidence was not closely balanced, so the first prong of the plain error analysis does not apply. Before conducting a plain error analysis under the second prong, we must first determine whether an error in fact occurred. *Sims*, 192 Ill. 2d at 621.

¶ 41    In *Medina*, the supreme court noted that the decision of whether to tender a lesser included offense instruction ultimately belongs to the defendant. *Medina*, 221 Ill. 2d at 403-04 (citing *People v. Brocksmith*, 162 Ill. 2d 224, 229 (1994)). We have found no case law extending the same reasoning to a tender of instructions on second degree murder, which is a lesser mitigated offense, not a lesser included offense, of first degree murder. See *People v. Parker*, 223 Ill. 2d 494, 504-05 (2006). A lesser included offense requires "proof of the same or less than all of the facts or a less culpable mental state (or both), than that which is required to establish the commission of the offense charged." 720 ILCS 5/2–9(a) (West 2002). In *Medina*, our supreme court explained that when a defendant chooses to submit a lesser included offense instruction, he is acknowledging that the evidence is such that a rational jury could convict him of the lesser included offense, and he is exposing himself to potential criminal liability which he might otherwise avoid. *Medina*, 221 Ill. 2d at 405. In contrast, the lesser mitigated offense of second degree murder is established where the required elements of first degree murder are present but the defendant shows by a preponderance of the evidence that a mitigating factor existed. *People v. Jeffries*, 164 Ill. 2d 104, 118 (1995).

¶ 42    It is not clear to this court that the same concerns surrounding the tender of lesser included offense instructions extend to the tender of lesser mitigated offense instructions. In submitting an instruction on a lesser mitigated offense, a defendant would not be exposing himself to potential criminal liability that he might otherwise avoid. Rather, the defendant would be arguing that he showed by a preponderance of the evidence that mitigating factors were present which demonstrate that he possessed a less culpable mental state at the time of the offense, which would support consideration of a lesser mitigated offense. Conversely, it could be argued that in the same way that a tender of a lesser included offense instruction constitutes an acknowledgment that the evidence is such that a jury could convict a defendant of the lesser offense, a tender of a lesser mitigated instruction could constitute an acknowledgment that the State has met its burden of proving first degree murder. Therefore, in the absence of a clear statement from our supreme court, we will treat the tender of a lesser mitigated offense instruction in a manner consistent with the tender of a lesser included offense instruction. See *People v. Kauffman*, 308 Ill. App. 3d 1, 11 (1999), *rev'd on other grounds*, *Parker*, 223 Ill. 2d 494 (noting that the distinction between lesser mitigated and lesser included offenses does not automatically preclude the principles developed in the context of lesser included offense instructions from being applied to lesser mitigated offense instructions). Thus, we conclude that under *Medina*, the circuit court erred in not questioning defense counsel in Wilmington's presence regarding the tender of the lesser mitigated offense instruction and also by not asking Wilmington whether he agreed with the tender. We must now determine whether this error was so fundamental that it affected the fairness of the trial and challenged the integrity of the judicial process.

¶ 43    We note that the defendant in *Medina* did not tender instructions on a lesser included

offense. *Medina*, 221 Ill. 2d at 409-10. The court further noted in passing that even if the defendant had tendered a lesser included offense instruction, he would not have been entitled to such an instruction because it was not supported by the evidence. *Id*. at 410. Thus, the supreme court did not reach the issue of whether the failure to question defense counsel in defendant's presence where defendant has tendered a lesser included instruction would constitute reversible error.

¶ 44    The supreme court observed in *Brocksmith* that the decision to tender a lesser included offense instruction is analogous to the decision of what plea to enter and the two decisions should be treated the same. *Brocksmith*, 162 Ill. 2d at 229. In the context of admonishments related to guilty pleas, the supreme court has noted that the failure to properly admonish the defendant does not automatically establish grounds for reversing the judgment. *People v. Davis*, 145 Ill. 2d 240, 250 (1991). The supreme court further explained that the failure to properly admonish is not reversible error unless real justice has been denied or the defendant was prejudiced by the error. *People v. Whitfield*, 217 Ill. 2d 177, 195 (2005). Therefore, we conclude that the failure of the circuit court to question defense counsel in Wilmington's presence regarding the tender of the lesser mitigated offense instruction did not, by itself, constitute reversible error. We cannot conclude that real justice was denied or that Wilmington was prejudiced by the error where he claimed in his statement that McWilliams produced the gun, Wilmington took it away from him, and then used it to shoot McWilliams when he charged at Wilmington with his head down. The giving of the second degree instruction without ascertaining whether Wilmington agreed with its tender did not prejudice Wilmington or render the proceedings fundamentally unfair where Wilmington acknowledged shooting McWilliams and critical details in his statement were independently corroborated, making it extremely unlikely that the jury would have returned a finding of not guilty had the instruction not been given. We conclude that the circuit court's error was not so fundamental that it rendered the proceedings unfair or challenged the integrity of the judicial system.

¶ 45                                CONCLUSION

¶ 46    Following our supreme court's decision in *Thompson*, Wilmington has abandoned his argument that the circuit court's failure to comply with Rule 431(b) rendered the proceedings fundamentally unfair. We hold that the evidence here was not closely balanced where the majority of the details in Wilmington's statement were consistent with the evidence and the most crucial detail in the statement, the highly unusual way in which the victim was killed, was independently corroborated. Moreover, the circuit court's error in not questioning defense counsel in Wilmington's presence regarding the tender of the lesser mitigated offense instruction and not asking Wilmington whether he agreed with the tender did not affect the fairness of the trial or challenge the integrity of the judicial process. Accordingly, we affirm Wilmington's convictions and sentences.

¶ 47    Affirmed.